# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |
| | and EEOC |

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Scott Richards (Represented by Jeanne Bynum Hipes, counsel@hipeslaw.com) | (443) 271-6343 | 3/29/82 |

**Street Address**      City, State and ZIP Code

658 Mask Rd, Brooks, GA 30205

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (_If more than two, list under PARTICULARS below._)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Warner Media LLC and Turner Services Inc. | 500+ | (212) 484-8000 |

**Street Address**      City, State and ZIP Code

c/o WarnerMedia LLC
30 Hudson Yards, New York, NY 10001
Attn Joe Song, SVP, Human Resources

| Name Local Representative for WarnerMedia LLC | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Val Rusk, Esq, McFadden Davis, LLC 800 Mt. Vernon Hwy, NE Suite 410 Atlanta, GA 30328 | | 678-831-5373 |

**Street Address**      City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest      Latest |

☐ RACE ☐ COLOR ☐ SEX ☒ RELIGION ☐ NATIONAL ORIGIN

12/18/2021

☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

☐ OTHER (Specify)    Equal Pay Act of 1963, (Pub. L. 88-38) 29 U.S. Code 8 § 206(d)

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

KELLY LEPCHITZ
NOTARY
EXPIRES
GEORGIA
Feb. 2, 2026
PUBLIC
COWETA COUNTY

4/29/22

Please see attached narrative.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

April, 29th 2022

Date            Scott Richards
                *Charging Party Signature*



4/29/22

KELLY LEPCHITZ
NOTARY
GEORGIA
EXPIRES
Feb. 2, 2026
COWETA COUNTY
PUBLIC

Sc

**SCOTT RICHARDS V. WARNER MEDIA LLC AND TURNER SERVICES INC.
EEOC CHARGE NARRATIVE**

April 29, 2022

### I.    Introduction

Charging Party, Mr. Scott Richards, was a hard-working, loyal, and extremely competent employee who worked for Warner Media LLC and Turner Services, Inc. (collectively "the Company") in the IT Department for over **seven years**.[1]  The Company is a large employer with more than 500,000 employees globally and is subject to the jurisdiction of the Equal Employment Opportunity Commission.   Mr. Richards was terminated after he refused to inject into his body a substance that violates his sincere religious beliefs—specifically, the Covid-19 vaccine, which is derived from aborted fetal cells.  Without medical knowledge or knowledge of anyone's medical condition or religious beliefs, and apparently without knowledge of the hazards affiliated with this experimental

---

[1] Mr. Richards began his career with the Company on April 28, 2014. He was hired as a Production Engineer originally and earned the title of Senior Broadcast & IT Engineer in 2017.  He has excelled in his position throughout his tenure, regularly earning positive feedback for his excellent work performance.  He earned $52.00 per hour ($120,000-$125,000 annually), as well as health, vision, and dental benefits. In addition, he regularly worked overtime, sometimes earning up to $140,000 yearly. His supervisor during the time of the events in this charge was Andrue Netcher ("Mr. Netcher").

1

Sc

vaccine[2] or its legal duty to follow the laws of informed consent,[3] or the religious freedoms established and protected by both Title VII and the U.S. Constitution, the Company mandated that certain employees be injected with the vaccine or lose their jobs. While the Company said it would accept requests for religious accommodation, the Company in fact ignored Mr. Richards' request for a religious accommodation for three months before finally denying it altogether under the guise of a purported undue hardship.

Regardless of his tenure, his sincerely held Christian religious beliefs, his value to the Company, or his cooperative willingness to continue the masking, social distancing, testing and/or working from home procedures that for so long had worked well for himself, many others, and for the Company at large, the Company summarily thrust Mr. Richards into the pit of unemployment for standing up for and following his religious beliefs. The Company's actions in failing to accommodate Mr. Richards' sincerely held religious beliefs and then terminating him for those beliefs is a violation Title VII of the Civil Rights

---

[2] The Vaccine was and is known to be dangerous or fatal especially to employees with certain medical circumstances and history. The Covid-19 virus, on the other hand, at the time decisions were being made about mandating vaccines, was known to be fatal only to an extremely small percentage of the population. See https://apnews.com/article/fact-checking-970830023526, July 23, 2021 ("On average about 98.2% of known COVID-19 patients in the U.S. survive"); http://vaersanalysis.info/ Summary as of 4/15/2022 ("Note that the total number of deaths associated with the COVID-19 vaccines is more than double the number of deaths associated with all other vaccines combined since the year 1990.") Notably also, the very definition of a vaccine was changed to accommodate this new, invasive, untried, untested technology, which has caused the death of an estimated 45,000 people and apparently hurried the deaths of others. See, e.g., Zelenko, The Vaccine Death Report, https://indepthnh.org/wp-content/uploads/2021/10/COVID-Report-from-Rep.-Weyler-3.pdf (as of September 17, 2021, already 726,963 people suffered adverse events, including stroke, heart failure, blood clots, brain disorders, convulsions, seizures, inflammations of brain & spinal cord, life-threatening allergic reactions, autoimmune diseases, arthritis, miscarriage, infertility, rapid-onset muscle weakness, deafness, blindness, narcolepsy, and cataplexy).

[3] All Emergency Use Authorization (EUA) vaccines, which includes all covid-19 vaccines available in the United States, are subject to the law of informed consent. See 21 CFR 360bbb-3, and 21 CFR 50.25, **Elements Of Informed Consent. These important laws require that anyone being administered the EUA Vaccine be informed that his participation is voluntary and "that refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty of loss of benefits…."**

2

Sc

Act of 1964, for Religious Discrimination and failure to accommodate, among other laws. **_Mr. Richards seeks an accommodation to the mandatory vaccine policy implemented by the Company._**

Of significance is the fact that **for months, Mr. Richards competently and successfully worked from home.[4]** He handled all the essential functions of his job and more by working entirely from home, physically away from others, and thus incapable of spreading Covid-19 to fellow employees.  During times when he was at the office, the Company's practice of social distancing, testing and masking proved adequate. Upon information and belief, no one became seriously ill or died in the area of the Company where Mr. Richards worked, or, as far as is known, anywhere in the Company in Atlanta— even in the significant "unvaccinated" Operations population the Company allowed.

Perhaps even more significant is the fact that the Company only mandated *some* of its employees to take the vaccine.  Although the Company touted the new vaccine policy as one designed for the *safety* of employees, other divisions within the Company were not subject to a similar policy. Indeed, Mr. Zucker, wrote to employees who were required to be vaccinated, ***"you may find yourself in contact with other non-sports and studios employees who may not be vaccinated in shared spaces, such as cafeterias or common areas. Please be mindful of that when making your own choices about your personal protocols."*** (Exhibit 1, July 15, 2021 Email Thread) ***It's*** troubling that the Company would call the mandate a "safety measure," but not require *all* employees within the Company to be bound by the mandate, especially when those others will necessarily be around other employees and customers.

Mr. Zucker also informed employees that, if needed, reasonable accommodations

---

[4] As others were, Mr. Richards was permitted to work remotely from August 9 through November 18, 2021, and neither his job performance nor the Company's interests were at all negatively impacted.

Sc

could be requested for medical or religious reasons, and that **the Company would make**
**best efforts to make reasonable accommodations on a case-by-case basis.** *Id.* In
addition, Mr. Zucker represented that the Company valued "flexibility" with regard to how
many and how frequently employees were required to be in the office. *Id.* He also
acknowledged that "there are some specific roles that can be done exclusively from
outside the office" but that the Company would leave those decisions to individual
managers. *Id.*

Mr. Richards followed the Company's procedures for requesting an
accommodation[5] for his sincerely-held religious beliefs which prohibit him from taking an
unreliable, unproven, and dangerous-or-fatal, experimental vaccine—developed from
aborted fetal cells.  As explained to the Company, Mr. Richards is a Christian committed
to Jesus Christ as his Savior. His religious practices include following the Word of the
Bible. His religion teaches that God created human beings in His image and that human
life is sacred. He believes that the human body and its human immune system should
function as God created it to function. *Id.* Christianity teaches that human life begins at

---

[5] The Company stated, "Employees who need an accommodation for a disability-
based reason or a specific medical contraindication, as well as employees who
have sincerely held religious beliefs against obtaining a vaccine, should submit a
request through our Xempt system. You should receive acknowledgement of your
submission within 24 hours with next steps on how to proceed with your request.
Requests will be addressed on a case-by-case basis.

"Employees with WarnerMedia credentials can log in to Xempt without requesting
access. If you do not have a WarnerMedia account, please send an email to
cv19accommodation@warnermedia.com to request access to Xempt…"

***"For roles that can be performed remotely, U.S.-based WarnerMedia***
***employees who are not vaccinated can continue to work remotely."*** (Exhibit
3, Accommodation Request Policy).

4

Sc

conception, and it is against his religion to have any procedure that would involve using aborted fetal cell lines. [6]

The Company did not dispute the veracity of Mr. Richards' religious beliefs and never asked that he provide any additional support. Nor did it attempt to have with Mr. Richards the required-by-law interactive discussion so that the employee and the Company could work together to jointly determine a way that the employee could continue to work.[7]

### Despite His Sincere Religious Beliefs, The Company Denied Mr. Richards' Reasonable Accommodation.

On November 2, 2021, nearly **three months** after his request, the Company finally responded to his request for a religious accommodation. Kristopher Williams ("Mr. Williams"), People Partner, Technology, emailed Mr. Richards and effectively terminated him. He told Mr. Richards that his request for the exemption from the mandated vaccine was denied and said,

> *"While you may be eligible to be considered for a reasonable accommodation, the company doesn't believe it can accommodate your request to return to work unvaccinated. The Company considered various potential accommodations and mitigation practices, including those you submitted in association with your accommodation request, but has determined that because your role requires on-site work in shared spaces and close contact with others, we could not adequately mitigate the health and safety risk to*

---

[6] See Religious Accommodation Request, Exhibit 2.

[7] See *Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149 (10th Cir. 2000), explaining: "This [religious accommodation] statutory and regulatory framework, like the statutory and regulatory framework of the Americans with Disabilities Act (ADA), involves an interactive process that requires participation by both the employer and the employee. See Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 69, 107 S. Ct. 367, 372, 93 L. Ed. 2d 305 (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that *HN6* bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies [**12] of the employer's business") (internal quotations and citations omitted)."
Thomas, *supra.,* 225 F.3d at, 1155.

5

Sc

*you and others.*" [8]

The Company went on to state, without explanation, and without the legally-required interactive discussion, that "enforcing mitigation efforts like masking and social distancing present an undue hardship to operations," even though he and many others had successfully worked remotely for months.[9]   Unsurprisingly, the Company provided no explanation of exactly what "undue hardship" was allegedly suffered.   No loss of income was cited.   No requirements of additional employees to do the same job.   Indeed, Mr. Richards performed fully and adequately working from home or when masking, social distancing and/or testing were employed by the Company.   Mr. Richards was also told that the Company was posting his position on November 18, 2021, and that he would be placed on a four-week paid leave. After that, if he was not fully vaccinated, his employment would be terminated effective December 18, 2021.

When Mr. Richards followed up to try to understand how accommodating his deeply held religious beliefs would unduly burden the Company, he got no real answer. Mr. Williams was unable to define "undue hardship" and instead merely reiterated that, "*the company is not able to accommodate an unvaccinated employee in your role because of health and safety risks and operational challenges.*"[10] He acknowledged that, while the Company considers possible ways to accommodate certain employees who cannot be vaccinated, that it does not need to do anything "that puts an unnecessary burden on the company."[11]   Apparently, accommodating "religion" is viewed as doing

---

[8] Exhibit 4, November 4, 2021 Email.
[9] Mr. Williams also recognized that working remotely was possible when no other options were available.
[10] Exhibit 4.
[11] Exhibit 4.

6

Sc

something "unnecessary."

Not one person at the Company has at any time explained what "undue burden" has resulted from the previously implemented safety procedures which seemed to work well, did not violate anyone's sincerely held religious beliefs, and had none of the grievous medical side effects that have been reported in VAERS and other places as a result of the vaccine.[12]  Indeed, the Company was making exactly those specific accommodations to all the other employees who were not covered by the mandate.  If it was not an undue burden for the Company to provide those safety measures to others, it certainly was possible (and not an "undue burden") to facilitate the sincere religious objections of Mr. Richards.

The Company's actions are an egregious infringement of Mr. Richards' Title VII and constitutionally protected rights. The policy, as implemented, has failed to consider, or adequately consider, the religious needs of multiple employees. The Company refused to make the accommodation, not based on an actual undue hardship, but because of concerns that "everyone working under [Mr. Richards'] title in the company would have to be given the same opportunity."[13]  Giving the requested accommodation to "everyone working under that title" shows no hardship at all, since everyone, with Mr. Richards' title

---

[12] No side effects of testing and masking were generally known at that time, but since then it has been discovered that masking is actually medically very unhealthy, the testing is entirely unreliable, and the up-your-nose testing is actually another vehicle of inserting foreign hazardous matter into the body.  See, e.g.,

Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards? Int J Environ Res Public Health. 2021 Apr; 18(8): 4344.
Published online 2021 Apr 20. doi: 10.3390/ijerph18084344
[13] Exhibit 5, Text Messages.

Sc

or not, was working successfully with the requested protocols in place.

While the topic of mandatory vaccines in employment is a frequently debated topic, those mandates have been deemed unlawful by relevant courts and governmental agencies.[14] Perhaps the most notable example of this is the Fifth Circuit's decision in _BST Holdings, LLC et al v. OSHA._ In that case, the plaintiffs sought a preliminary injunction to stop the mandatory vaccine requirement that would have affected all employers of over 100 employees. The preliminary injunction was granted by the Fifth Circuit court and the mandatory vaccine was halted when the court recognized the substantial burden and irreparable injury individual employees suffer when "put to a choice between their job(s) and their jab(s)." The United States Supreme Court upheld that decision on January 13, 2022 in _National Federation of Independent Business, et al v. OSHA_, 595 U.S. __ (2022).

The court in _BST Holdings_ rightly found that the loss of constitutional freedoms [which would include loss of religious freedoms guaranteed by the U.S. Constitution and Title VII] "for even minimal periods of time…unquestionably constitutes irreparable injury," citing _Elrod v. Burns_, 427 U.S. 347, 373 (1976). The 5th Circuit further describes the Vaccine Mandate as exhibiting "grave statutory and Constitutional issues" and a "one-size-fits-all sledgehammer that makes hardly any attempt to account for differences in workplaces (and workers) that have more than a little bearing on workers' varying degrees

---

[14] See, e.g., Alabama Governor Kay Ivey's Executive Order No. 724 addressing the "illegal overreach" of the vaccine mandate dated Oct. 25, 2021; See also, https://www.fiercepharma.com/pharma/fdasays-label-warning-coming-for-heart-inflammation-pfizer-bnt-moderna-covid-19-vaccines; Julie J. Sorensen and Dr. V. Zelenko, The Vaccine Death Report, September 2021, found at http://indepthnh.org/wp-content/uploads/2021/10/COVID-Report-from-Rep.-Weyler-3.pdf.

Sc

of susceptibility to the supposedly 'grave danger' the Mandate purports to address." Indeed, the UPS mandate suffers these same shortcomings.

The U.S. Supreme Court has stated that the protected liberty claims inherent in personal autonomy and bodily integrity include both the right *to be free from* unwanted medical intervention, and the *right to* obtain medical intervention.  See, e.g., _Cruzan v. Director, Mo. Dept of Health_, 497 U.S. 261 (1990) ("the Due Process Clause protects the deeply personal decision of the individual to refuse medical treatment, it also must protect the deeply personal decision to obtain medical treatment, ….").  See also re forced medical treatment:  _Rochin v. California_, 342 U.S. 165, 172(1952) (officers forcibly pumping suspect's stomach for morphine capsules found to "shock the conscience"); _Hefferan v. Corda_, 498 F. App'x 86, 89 (2d Cir. 2012) (stating that "arbitrary" and "outrageous" Government action satisfies shock the conscience standard).

The injury Mr. Richards has suffered is real. One should never have to choose between his deeply seated religious beliefs—the very core of who he is—and maintaining his employment to support his family. Most Americans today struggle to pay their bills with the job they have, leaving them living paycheck to paycheck. The added burden of being asked to abandon their core beliefs adds unbearable and unjustifiable hardship, a hardship Congress sought to obliterate in Title VII, and a right our forefathers fought and died for in creating religious freedom and the religious freedom mandates of the U.S. Constitution.

The EEOC's review of all religious (and medical) accommodations requested by other employees will likely shed light on Warner Media's true motives.  The evidence is expected to inform a conclusion that neither safety nor undue hardship generated the

9

Sc

Company's decision to terminate Mr. Richards.  Rather, it was religious discrimination and an intentional refusal to accommodate.  It will be the Company's burden to prove otherwise.

**A.     The Company's policy mandating the Covid-19 vaccine without regard to an employee's religious beliefs is a violation of Title VII.**

Title VII prohibits employers from discriminating against their employees on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).   The prohibition against religious discrimination "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observation or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

*1.     The facts establish a prima facie case of religious discrimination.*

In a claim for failure to accommodate, a plaintiff must first establish a *prima facie* case of religious discrimination by "present[ing] evidence sufficient to prove that (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement.'" *Morrissette-Brown v. Mobile Infirmary Med. Ctr.,* 505 F.3d 1317, 1321 (11th Cir. 2007).

Mr. Richards can obviously meet this burden. First, he explained in his accommodation request that his Christian beliefs prevented him from receiving the injection. Indeed, he very clearly and in detail set forth his beliefs, stating ***"I am a Christian committed to Jesus Christ as my Savior and Lord and following His Word, the Bible. I am requesting a religious exemption from the COVID-19 vaccines. My sincerely held Christian beliefs prevent me from receiving the COVID-19 vaccines."***

10

Sc

(Exhibit 2).

His beliefs were not questioned, and the Company did not ask him to provide any additional information relative to his request. Instead of engaging in any interactive process with Mr. Richards, as is required by law, Warner Media ignored him <u>for three months</u>, until he was abruptly told he would be terminated.

2.    *The Burden is Now on the Employer to Prove Accommodation is an Undue Burden.*

When, as here, the plaintiff proves these three elements, "the burden shifts to the employer to establish that it provided the employee with a reasonable accommodation or that an accommodation would cause an undue hardship." <u>*Dalberiste v. GLE Assocs., Inc.,*</u> 814 F. App'x 495, 497-98 (11th Cir. 2020). *Indeed, in the present case, it* **is the Employer's burden** to prove that its attempted coercion of an employee to abandon his sincerely held religious beliefs by threatening termination (while concurrently refusing to discuss or accept or propose ANY reasonable accommodation) was somehow justified. The Employer **must *prove*** in this case that ANY accommodation at all would cause the Employer "undue hardship" and must also somehow justify its failure to engage in any meaningful interactive discussion. Indeed, the Company's burden of proof in the case of this 7-year stellar employee with sincere religious beliefs is a heavy one.

The federal case of <u>Adeyeye v. Heartland Sweeteners,</u> LLC, 721 F.3d 444 (2013) is instructive in determining whether an employer has met is burden of demonstrating a religious request would result in an "undue burden" to it.  While employers often try to assert that any burden at all—anything above a "de minimus" burden--is too much burden for them to bear to accommodate a religious accommodation request, the Federal court in <u>Adeyeye,</u> *supra.* has put an end to that argument.  The Seventh Circuit explained:

11

Sc

Heartland argues, nevertheless, that *any* inconvenience or disruption, no matter how small, excuses its failure to accommodate relying on the language in <u>*Trans World Airlines, Inc. v. Hardison*</u>, 432 U.S. 63 (1977) saying that an **<u>*accommodation*</u>** of religion **<u>*requiring*</u>** anything more **than** a "*de minimis* cost" creates undue hardship. ***Heartland has read too much into this phrase*** in <u>Hardison.</u> The Equal Employment Opportunity Commission reads the *Hardison* language as meaning that regular payment of premium wages (such as overtime or holiday wage rates) for substitutes would impose an undue hardship, while **administrative costs such as those incurred in rearranging schedules and recording substitutions for payroll purposes would not amount to an undue hardship**. <u>*29 C.F.R. § 1605.2(e)(1).*</u>

\* \* \*

Finally, we consider Heartland's argument that it did provide Adeyeye with a reasonable *accommodation* in the form of voluntary self-termination with the possibility of being rehired. Heartland had the good sense to relegate this argument to a footnote. It has little to recommend to it. We strain to imagine a situation in which such an offer could be considered an *accommodation*, nor could we locate a federal court in the country opining that such an accommodation could be reasonable for a <u>*religious*</u> request. ***Title VII does not contemplate asking employees to sacrifice their jobs to observe their <u>religious</u> practices. At the risk of belaboring the obvious, Title VII aimed to ensure that employees would not have to sacrifice their jobs to observe their <u>religious</u> practices. An option of voluntary termination with the right to ask for one's old job later is not a reasonable <u>accommodation</u>.***

Id., 721 F.3d at 456.  Emphasis added.

We note that the Equal Employment Opportunity Commission ("EEOC") has already opined that the accommodations suggested by Mr. Richards are a reasonable alternative to a vaccination. Indeed, in "<u>What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws</u>," under K.2 (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws) the EEOC said,

> *"For example, as a reasonable accommodation, an unvaccinated*

12

Sc

> *employee entering the workplace **might wear a face mask, work at a social distance from coworkers or non-employees**, work a modified shift, get periodic tests for COVID-19, be given the opportunity to **telework**, or finally, accept a reassignment."* (Emphasis added.)

Finally, the mandate was not a uniform policy company wide. The fact that the Company was choosing not to mandate that <u>all</u> employees receive the vaccine *demonstrates that it could have permitted Mr. Richards to decline the vaccine and continue working.* We are confident a review of the Company's entire record of employees will show the inconsistent application of the mandate and the ease with which the accommodation could have been provided.

**B.    The Company's decision to terminate Mr. Richards for his failure to obtain the vaccine is religious discrimination.**

The Company's actions also constitute a violation of Title VII for religious discrimination in termination. Despite Mr. Richards' compliance with all rules, and despite his deep sincerity about his religious convictions, the Company, shockingly, flatly refused to grant his accommodation request. Instead, *without the required interactive discussion*, we understand the Company demanded that Mr. Richards give up his religious beliefs and commit to taking the potentially life-altering, life-threatening, and spiritually-condemning vaccine or be fired.

To demand that he allow a syringe derived from human fetal cells to puncture his skin and physically fire into his body religiously-despicable fluid is morally reprehensible to say the least, and also violates a plethora of other laws. In fact, the very demand that he submit to this invasive procedure by those with no medical degree or training, and without regard to or adequate knowledge of the medical circumstances of Mr. Richards or any other employee, raises numerous additional legal and ethical issues in addition to religious discrimination. These include, without limitation, Constitutional issues of bodily integrity, personal choice, the Constitutional right to privacy, right to medical privacy, an individual's right to choose his medical treatments, the doctrine of informed consent, and even the tort of assault and battery. We find the company's indifference to Mr. Richards' sincerely held religious beliefs, as well as to his spiritual and physical health, by

13

Sc

mandating that an un-Constitutional and unlawful vaccine be forced into Mr. Richards's physical body, both shocking and illegal.

It is well-documented that the experimental and unapproved COVID-19 vaccine is developed from aborted human fetal cells.   The exercise of his religious beliefs by refusing the fetal-cell-developed vaccine and by maintaining his physical body's integrity, is his absolute right and is blatantly and illegally interfered with by threatening his termination. His right to exercise and practice his religious beliefs is mandated by the U.S. Constitution and Title VII, the Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et seq (1964), and the regulations interpreting these important laws.

The EEOC has also explained this in its publication, "What You Should Know About COVID- 19 and the ADA, the Rehabilitation Act, and Other EEO Laws" ("EEOC Doc"), recently cited with approval by OSHA in the Vaccine Mandate rule demanded by President Biden, 86 FR 61402:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer *must* provide a reasonable accommodation unless it would pose and undue hardship.

EEOC Doc 42/53.  Emphasis added.

Further, as the EEOC Doc, *supra.*, asserts, one of the considerations in determining a reasonable accommodation in view of the vaccine mandate is an analysis of how many people have already been vaccinated, and how many he will be around. Since, no doubt, a high percentage of employees have been coerced into compliance already and thus have been vaccinated, the chances of Mr. Richards being around those "unprotected by the vaccine" are practically nil—especially since he works from home. See EEOC Doc 39/53.

## IV.    Damages

Mr. Richards' damages in this case are significant. He has not only lost wages and incurred attorney fees, but the emotional toll caused by the Company's actions cannot be understated. Mr. Richards experienced tremendous stress and anxiety over his unknown

14

Sc

employment status. He was left for months wondering whether he would have a source of income to support his family. Now months later after his abrupt termination, he has yet to replace his income. Title VII recognizes and allows compensation for this kind of mental anguish.  As an employer with more than 500 employees, Mr. Richards is entitled to recover up to $300,000 in compensatory damages for this damage alone, in addition to front pay, back pay, interest and attorney fees.

## IV.    Conclusion

Religious freedom is one of the cornerstones of this country. As a country, a legal system, we value an individual's right to the freedom of religion, whatever that may be. Our forefathers fought for this right, and it is a key tenant of the U.S. Constitution as well as in Title VII.  Warner Media's mandate tramples those principles by forcing employees to choose "the jab" against their religious beliefs or suffer a devastating loss of their job. The employer's arbitrary vaccine policy is nothing more than a forced medical procedure. There is no law that permits this kind of forced medical procedure upon masses of employees, especially by non-medically trained decision makers, and without even a thought of the law of informed consent, rights of personal autonomy or religious freedom. Such outrageous actions not only stun the sensible, they blatantly defy Title VII, the U.S. Constitution, and the law of informed consent.

Warner Media's discriminatory actions have far-reaching effects. The Company needs a systemic change in its policies to prevent further infringement of employees' religious freedom and other individual rights. The Company (and those like it) need a message that in the United States we value religious freedom above everything else.  The EEOC has the power to make that statement heard.  We ask that a thorough investigation

Sc

ensue and that a finding of cause be issued for Mr. Richards and against Warner Media.

                              **Sincerely yours,**

                              *Jeanne Bynum Hipes*

                              **Jeanne Bynum Hipes**
                              **Hipes Law LLC**

**Hipes Law LLC**
2475 Northwinds Parkway, Suite 200
Alpharetta, Georgia 30009
Main:  (678) 867-7006
Fax:    (770) 783-5010
Email: Counsel@HipesLaw.com

 **Gmail**

EXHIBIT 1
Scottee LP <scotteelp@gmail.com>

## Fwd: Important Update on Vaccine Policy
1 message

**Richards, Scott** <scott.richards@warnermedia.com>     Thu, Jul 15, 2021 at 1:03 PM
To: Scottee LP <scotteelp@gmail.com>, "shellster2273@gmail.com" <shellster2273@gmail.com>

-S-

**From:** WMTO HR <WMTO.HR@turner.com>
**Sent:** Thursday, July 15, 2021 9:17:33 AM
**Subject:** Important Update on Vaccine Policy

*Earlier today, Jeff Zucker sent the below note to News & Sports sharing that his team members will be required to be fully vaccinated to return to the CNN and Sports workspaces in the U.S.. The message also requests that support functions entering the CNN or Sports workspaces to perform services must also be fully vaccinated. If you are receiving this email, you have been identified as a WMTO team member who, by virtue of this policy and the work you do within News & Sports locations and offices, will be required to be fully vaccinated as well. Fully vaccinated means that you are two weeks past your last vaccination date.*

*Your vaccination status will need to be confirmed via Passcard, which you can enter here at any time. If you have not already done so please enter your vaccine information in Passcard as soon as possible. If you need to request a medical or religious accommodation to the vaccination policy, please contact your HR leader by no later than August 1.*

*We recognize this is a change in the enterprise-wide WarnerMedia policy regarding vaccines and is being done to support the unique needs of the News & Sports business model. Thank you for your support with this important initiative.*

*If you have any questions, please do not hesitate to reach out to me or a member of the HR team.*

*Sharon*

_____

–

Case 1:23-cv-05587-JPB-CCB    Document 1-2    Filed 12/06/23    Page 20 of 146

**From:** Jeff Zucker, (CNN Worldwide) <Jeff.Zucker2@turner.com>
**Sent:** Wednesday, July 14, 2021 11:25 AM
**To:** *TSports - Sports Expanded <TSports-SportsExpanded@turner.com>; *Turner Studios All
<TurnerStudiosAll@turner.com>
**Subject:** A Note from Jeff



July 14, 2021

I hope everyone is enjoying the Summer, which – incredibly – is now more than halfway done.
And, so, our thoughts turn to the new school year, the Fall and our previously announced
official return to the office.

As you know, we have set August 2 as our date to return to the office in Atlanta (to coincide
with the start of the school year locally) and September 7 for the rest of our domestic locations.
Those dates are fast approaching, so we wanted to provide you with our latest thinking.

We recognize it has been a difficult 18 months, personally and professionally. The pandemic
has upended our lives. As of today, a relatively small percentage of our Turner Sports and
WarnerMedia Studios employees have been working in the office, with nearly all of them in
essential roles directly associated with our productions. In the weeks ahead, we look forward to
getting the rest of you back into our offices. But we know that coming back will not be the
same, or easy, for everyone. As I have said many times, we intend to be sensitive to individual
needs and as flexible as possible ... all while fulfilling our business goals, restoring our office
culture and ensuring the highest degree of safety possible.

We understand that each part of the company has unique roles and needs. That is why we have decided *against* a uniform policy across Turner Sports, Bleacher Report and Studios. As a result, in the coming weeks, your manager will be reaching out to talk about how each department will approach the return, if that hasn't happened already. As a general guideline, we expect that most of our employees will return to the office with some level of consistency over the remainder of the year. But each division will ultimately set its own guidelines. Some may require fewer days and some may require more.

While flexibility will be paramount, we do strongly believe there is value in being back in the office together on a regular basis. Our work is an inherently collaborative and creative process. Working together will help restore our office culture and allow for quicker decision making. It is true there are some specific roles that can be done exclusively from outside the office – and we will leave that to individual managers to make those decisions.

As I noted, you will hear from each of your department leaders and managers in the next few days with more details. While each department may vary, there are some things that will be in force across the board.

Most importantly, Covid-19 vaccines will be required to return to the office. You will need to be fully vaccinated upon return to work, which means two weeks past your final shot. This policy will play an important part in contributing to a safer work environment. And that is our priority.

This means that every Turner Sports, Bleacher Report and Studios employee who comes to any of our office locations, our studio or remote events must be fully vaccinated.

For those who are not Turner Sports, Bleacher Report or Studios employees but interact with us, such as our security, properties and engineering colleagues, they will also need to be fully vaccinated to enter one of our dedicated floors or workspaces. Their management teams are fully aware of this requirement and are informing them, as well. This will ensure that our Turner Sports, Bleacher Report and Studios floors and office spaces will have only vaccinated people using them. This requirement will also extend to any visitors to our office spaces.

You will be required to confirm your vaccination status via Passcard when you enter any of our buildings. You can find more information about how to use the Passcard system here.

To be clear, this only applies to our employees and offices in the United States. For anyone outside the United States, you will continue to follow local rules and regulations. Your managers will follow up with the latest thinking in your region.

In the United States, when working in a Turner Sports, Bleacher Report or Studios office location, masks and social distancing will not be required, because everyone in our offices will be vaccinated. Of course, if you feel more comfortable wearing a mask some or all of the time when you are in the office, you are welcome to. In most of our locations, our conference rooms will once again be open and more information on amenities such as the cafeterias, pantries and gym access, will be shared in advance of our return to the office.

Other divisions of WarnerMedia will not all be instituting the fully vaccinated requirement. Therefore, you may find yourself in contact with other non-sports and studios employees who may not be vaccinated in shared spaces, such as cafeterias or common areas. Please be mindful of that when making your own choices about your personal protocols.

One thing we have learned about this pandemic is that things can change. We will continually review the protocols we have in place to be sure we are current with local guidelines, health and safety recommendations and medical guidance. We may adjust things down the road. Everything we are doing is to keep you safe.

It is important to note that if you need to, you can request a reasonable accommodation to the vaccination policy for medical or religious reasons through your HR leader. We will make best efforts to make reasonable accommodations on a case-by-case basis.

Our first priority is keeping our employees safe. So, again, to be absolutely clear: you must be fully vaccinated to come into any Turner Sports, Bleacher Report or Studios workspace. The vaccine is your ticket to entry.

I know there will be questions about all of this. And I know that there is a lot to take in here. The keys are safety and flexibility. We know we are all individuals, with different needs and situations. Please take time to digest all of this, talk to your manager and your HR partner. We look forward to seeing even more of you this Fall.

Jeff

EXHIBIT 2

 Gmail

Scottee LP <scotteelp@gmail.com>

## FW: Accommodation Request Submitted

1 message

**Richards, Scott** <scott.richards@warnermedia.com>                    Tue, Aug 17, 2021 at 12:08 PM
To: "shellster2273@gmail.com" <shellster2273@gmail.com>, Scottee LP <scotteelp@gmail.com>

Below our my responses to the questions I attached.

- I am a Christian committed to Jesus Christ as my Savior and Lord and following His Word, the Bible.
- I am requesting a religious exemption from the COVID-19 vaccines. My sincerely held Christian beliefs prevent me from receiving the COVID-19 vaccines. The Bible teaches that God created human beings in his image (Genesis 1:26-27). This means that human life is sacred, and God created the human body and its human immune system to function as he created it. The Bible also teaches that human life begins at conception (Psalm 139:13-16). Therefore, abortion is the taking of a human life and is murder and forbidden by God (Exodus 20:13). The COVID-19 vaccines use fetal cell lines from aborted babies in a part of the process of their creation and development which violates God's will against abortion as described above. The COVID-19 vaccines also interfere with the function of the human immune system which God created by inserting genetic code instructions into the cell that does not originate from the DNA in the cell. Therefore, this process violates God's will for humanity.
- Similar to the start of the pandemic until present day, remote work accommodations will help ensure the company's safe and healthy workplace. Also, continuing the current approach of mask/gloves wearing and social distancing when on site would also ensure a safe and healthy work environment for others and myself.  During the last 18 months, my colleagues and myself have been coming on site following the safety protocols, and there was not one outbreak that was traced back to our group -- other groups that were coming on site did have outbreaks that occurred, but not Sports Central Engineering. When following the safety protocols the company has implemented to keep us safe, Sports Central Engineering is a prime example of how successful we all can be when following the safety protocols of using PPE effectively and social distancing respectfully.
- In my opinion, my more than seven-year tenure, specifically the last 18 months, have verified how dedicated and committed I am to the company and keeping all of us safe. For Christians, all of our religious beliefs are based on the Bible. The Bible reveals to us what God's will is and we are committed to believing it and following it on a daily basis. As in all my beliefs, I live by them and express them to others. Also, it has caused me not to receive the COVID19 vaccines.

Attached my day-to-day with this summary.

• Production Support of Mac, Windows and Linux clients.

• EVS Broadcast Systems for Ingest/Playout core functions and support for internal and external partners. Client build of EVS IPlink Adobe Plugin.

• IPV/Curator MAM server, client build, integration and support.

• Build, Support and Operation of Windows and Linux gateway servers.

• Collaborate across departments to make internal Engineering processes more effective and to improve the overall User experience.

• Support NBAtv, DOTCOM and TNT personal via Cisco Webex to remotely support the Live Events scheduled daily.

• Support Digital Media Coordinators with Daily duties for backup/archive.

• Build innovative solutions that help bridge the gap of technologies that are critical to the success of our digital workflows to support of Sports Stakeholders.

---

**From:** WarnerMedia Xempt <notifications@xempt.warnermedia.com>
**Date:** Tuesday, August 17, 2021 at 12:04 PM
**To:** "Richards, Scott" <scott.richards@warnermedia.com>
**Subject:** Accommodation Request Submitted

# Accommodation Request Submitted

Dear Scott Richards,

Thank you for submitting your accommodation request (ID: a651bb).

Generally, you can expect to hear back from us within 24 hours on weekdays to request additional information if required and confirm next steps to proceed with your submission.

For any questions, please email CV19accommodation@warnermedia.com.

My Requests

This email was sent by Xempt

Support

**3 attachments**



**xempt_religious_2.png**
183K

**xempt_religious_1.png**
166K

**xempt_home.png**
139K

WarnerMedia ONE

# COVID-19 Vaccination & Reporting

United
States        - April 12, 2021



Help make it the
safest comeback ever
Share your vaccination status

Return to
Offices

Select Your Work Location

# Get Vaccinated



# Report Your Vaccination



# FAQs



*Page updated on October 6, 2021*

Health and safety remain top priorities, and the Company strongly encourages everyone to get a COVID-19 vaccine as soon as it becomes available to them. Beginning September 6, 2021, WarnerMedia will require proof of vaccination for employees and visitors to enter any WarnerMedia office building in the United States. Proof of vaccination must be shared via WarnerMedia's Passcard system. Employees who require an accommodation for medical or religious reasons will be able to make the request through the process described below. We will address these accommodation requests on a case-by-case basis.

WarnerMedia is reviewing legal guidelines for potential vaccination requirements outside of the United States. More details will be announced when possible.

Anyone fully vaccinated against COVID-19, defined as two weeks after the final dose of a given vaccine, must still follow all   Workplace Safety Protocols for the work location.

## GET THE COVID-19 VACCINATION

Get the Facts: Latest Health & Wellness Expert Resources









We understand some employees may be concerned about getting the vaccine. Employees are encouraged to consult their healthcare provider and review the following resources to learn more:

Mount Sinai Health System Resources:

Mount Sinai Health System Resources:

- Flu Shots and COVID-19 FAQ

- COVID-19 Vaccine Boosters: What You Should Know (U.S., Canada and the UK)

- Back-to-School in a Pandemic: What to Know

Cavendish Health Resources:

- Cavendish Health COVID-19 Vaccine FAQ - UK

World Health Organization and Centers for Disease Control and Prevention Resources:

- WHO Vaccine Information

- Key Things to Know about the U.S. COVID-19 Vaccination Program

- Benefits of Getting a COVID-19 Vaccine

- Different COVID-19 Vaccines

- Facts about COVID-19 Vaccines

- What to Expect at Your Appointment to Get Vaccinated for COVID-19

- Frequently Asked Questions about COVID-19 Vaccination from the CDC

- Frequently Asked Questions about COVID-19 Vaccination from the WHO

## ACCOMMODATION PROCESS

We are mandating vaccines for U.S. employees whose jobs require them to work in WarnerMedia workplaces. (Please note that we are also working with our labor partners to determine how we can address this for those employees who are represented by various unions.)

Employees who need an accommodation for a disability-based reason or a specific medical contraindication, as well as employees who have sincerely held religious beliefs against obtaining a vaccine, should submit a request through our Xempt system. You should receive acknowledgement of your submission within 24 hours with next steps on how to proceed with your request. Requests will be addressed on a case-by-case basis.

Employees with WarnerMedia credentials can log in to Xempt without requesting access. If you do not have a WarnerMedia account, please

Employees with WarnerMedia credentials can log in to Xempt without requesting access. If you do not have a WarnerMedia account, please send an email to cv19accommodation@warnermedia.com to request access to Xempt. We'll create an account for you in the Xempt system and send you an email with instructions on how to finish your account setup and access the system.

For roles that can be performed remotely, U.S.-based WarnerMedia employees who are not vaccinated can continue to work remotely with their manager's approval.

## BENEFITS COVERAGE & COST

Every country will be handling the vaccination rollout differently. Depending on the country, the cost of the vaccine may be covered by your medical plan, through social care, or only through private means. Please check with your local healthcare provider for further information on coverage and the claims process.

In the U.S., the cost of the vaccine is covered under most Company medical plans, for those employees participating in such plans. Employees may need to present their health insurance information to the vaccine provider(s) to cover the cost of the vaccine.

## TIME OFF FOR VACCINATION

Managers and supervisors should be flexible and support time off if employees are unable to get vaccinated during non-work hours. If a U.S. non-exempt employee must take time off work to get the vaccine, time should be coded to the Grant Days/Hours code.

## REPORT YOUR VACCINATION

Help make it the



# safest comeback ever
## Share your vaccination status

**Return to Offices**

We're in this together. Getting the vaccine helps protect you and those around you. Reporting that you are fully vaccinated is required to access WarnerMedia's United States offices (starting on Sept. 6, 2021).

Reporting is easy and takes less than two minutes. Visit WarnerMedia's Passcard site to log your vaccination date(s). Check out our Passcard page for step-by-step instructions, and please see below for FAQs specific to vaccination reporting.

**<u>Important note</u>: When uploading your vaccination card image, please use a PNG or a JPG file. Passcard does not accept PDFs.**

---

## FAQs: COVID-19 VACCINATION & REPORTING

˅

WARNERMEDIA COVID-19 VACCINATION POLICY

**Are employees required to get the vaccine?**

From September 6, 2021, WarnerMedia employees in the United States will be required to be fully vaccinated, defined as being two weeks past the final dose of a given vaccine, to enter WarnerMedia offices. Proof of vaccination must be shared via WarnerMedia's

Passcard system. WarnerMedia will offer an accommodation process for medical or religious reasons (see process above).

For roles that can be performed remotely, U.S.-based WarnerMedia employees who are not vaccinated can continue to work remotely with their manager's approval. We encourage employees to work closely with their managers and HR representatives to determine what works best for the role and the individual.

WarnerMedia is reviewing legal guidelines for potential vaccination requirements outside of the United States. More details will be announced when possible. Please note that we are also working with our labor partners to determine how we can address this for those employees who are represented by various unions.

We strongly recommend the vaccine to all of our third-party partners.

**Why is WarnerMedia requiring proof of COVID-19 vaccinations in the U.S. only?**

The ongoing COVID-19 pandemic has been an incredibly dynamic situation, and as experts have learned more about the virus and provided updated guidance on how to slow and stop the spread, we have adjusted our policies. Wearing masks, social distancing, and enhanced cleaning requirements have helped protect our employees to date; vaccines are the best protection against severe illness, hospitalization, and death caused by COVID-19, including cases attributed to the Delta variant. In order to allow normal additional operations to resume and workplace capacity to increase to pre-pandemic levels, we believe the appropriate measure at this time is to require the vaccine in locations where legally permissible and where vaccines are readily available.

**What happens if I don't get and report a vaccination or request an accommodation to exempt me from the requirement? Will I be able to come into a WarnerMedia office?**

In the vast majority of cases, no. We are asking all employees who have not been vaccinated to work remotely if their manager agrees. If your role does not allow you to work remotely, please reach out to your manager and your HR partner to discuss next steps.

**Is WarnerMedia requiring COVID-19 booster shots? Is getting a booster shot required to be "fully vaccinated"?**

No, booster shots are not required at this time. Fully vaccinated is defined as being two weeks past the final required dose of a given vaccine.

Mount Sinai Health System provided a brief focused on COVID-19 boosters and additional doses in August 2021, which can be reviewed here.

**Do I need to make an appointment to get vaccinated?**

Please check your local requirements. You may also consult your health care provider for up-to-date information.

**Will WarnerMedia secure vaccines for employees?**

The company has hosted vaccination clinics at major U.S. offices, and may host vaccination clinics in the future. If you are eligible and have an opportunity to get the vaccine in your region now, you are strongly encouraged to do so.

**If I want to get a booster shot, will WarnerMedia secure them for employees?**

WarnerMedia has hosted COVID-19 vaccination clinics in the U.S., and may host additional clinics in the future pending demand.

**I have only received my first dose of a two-dose vaccination. May I return to a WarnerMedia office?**

No. Our policy requires full vaccination, defined as two weeks after your final dose of a one- or two-shot vaccine, or an approved accommodation to return to our WarnerMedia offices. Please wait to come into a WarnerMedia office until you are fully vaccinated.

**What vaccinations are accepted by WarnerMedia? What vaccine do I have to get to be considered "fully vaccinated"? (e.g. Pfizer, Moderna, Astra-Zeneca, Johnson & Johnson, etc.)**

WarnerMedia will accept any vaccinations that have received an authorization, including for emergency use, from the U.S. Food & Drug Administration (FDA) or the World Health Organization.  If you are working on Production, the new Union RTW Agreement only accepts vaccines with authorization, including for emergency use, from the FDA.

**What if I am vaccinated but do not want to come into a WarnerMedia office?**

WarnerMedia is adopting a flexible work policy as offices reopen. Individuals should work with their manager to develop an in-office and flexible arrangement that is appropriate for the team, role, and the individual's needs.

**If I have guests coming into a WarnerMedia office for a meeting, do they have to be vaccinated?**

WarnerMedia guests will also be required to be fully vaccinated and to attest to their vaccination in Passcard before entering WarnerMedia's United States worksites. If guests are unable to attest to their vaccination, arrangements can be made to join meetings virtually (Microsoft Teams and Webex). Please note that customers at retail and tour centers are not required to be vaccinated at this time.

**Will WarnerMedia's vaccination policy allow for proof of antibodies in lieu of reporting full COVID-19 vaccination?**

No. In the United States, proof of full COVID-19 vaccination is required to enter a WarnerMedia office after Sept. 6, 2021. In all other territories, COVID-19 vaccination and reporting is strongly recommended. Mount Sinai Health System offers this brief on current research (as of Sept. 2021) on the limits of natural immunity.

**Are we allowing employees to come into the office if they are not vaccinated?**

Generally, no.  If an employee has an exemption from the vaccination mandate approved through WarnerMedia Xempt, for example, due to an accommodation for medical or religious reasons, mitigation measures, such as working remotely, or other ways to do their work, will be considered first. If an employee's work cannot be done remotely, the employee may be permitted to come into the office unvaccinated, subject to various mitigation measures such as masking, testing 2x/week and distancing when able if it does not present an undue burden to business operations. The WarnerMedia CCO team will work with employees who are required to test to ensure their testing requirement is met.

**If we have a COVID-19 vaccine mandate, why is the Company allowing unvaccinated individuals to come to work?**

Our goal is to reduce risk as much as possible, and the WarnerMedia vaccine policy applies to employees and guests invited to our facilities for business meetings or on-site events.  We consider limited exemptions to the vaccine requirement for WarnerMedia employees, as legally required, for medical or religious reasons. Individuals granted an exemption may be allowed into the workplace, provided they adhere to mitigation measures, including masking, adhering to a regular testing schedule and distancing when able.

Customers visiting our retail stores and renting from businesses (e.g. property, costume) or tour guests are not subject to the vaccination mandate.  Personal visitors (e.g. family and friends) are not permitted at this time.

We are not able to mandate the vaccine for employees of vendors or some Union represented employees.  However, business stakeholders are working with 3rd parties to staff our projects with only fully vaccinated individuals.  In some limited cases, based on the nature of the service provided and the contract with the vendor, we may not have the ability to influence the vaccine status of these individuals.  In addition, others over whom we have no control provide critical business operations services, e.g postal service, fire/police, phone service providers, etc., at our facilities daily. Such individuals are asked to provide their vaccination status, and, if they choose not to share, are considered unvaccinated and must wear a mask and always maintain social distancing.

**Will WarnerMedia provide testing for all employees?**

For employees who have been fully vaccinated and wish to have a little extra peace of mind, WarnerMedia is offering employees free, voluntary COVID-19 tests at major U.S. office locations (Burbank lot, Ivy Station, Hudson Yards, Techwood, and the CNN Center). Please visit our COVID-19 testing page for details.

For employees who are unvaccinated and have been granted an approved accommodation with a testing requirement, WarnerMedia is offering employees free, mandatory COVID-19 tests at major U.S. office locations (Burbank lot, Ivy Station, Hudson Yards, Techwood, and the CNN Center). Accommodations with testing require COVID-19 tests 2x/week. Please visit our COVID-19 testing page for details on the WarnerMedia testing locations.

For employees who are unvaccinated and have been granted an approved accommodation with a testing requirement but do not have access to a WarnerMedia testing facility, they may test privately and submit the cost of the test for reimbursement to T&E. If you have tested with an outside provider, results must be shared with the WarnerMedia CCO, Kara Tabor at kara.tabor@wmcontractor.com.

**How are third-party vendors handled with respect to the WarnerMedia Vaccine Mandate Policy?  How do we direct third-party vendors who are requesting accommodations?**

- Third-party vendors are not WarnerMedia employees and therefore do not fall within the WarnerMedia Vaccine Mandate Policy.

- Nevertheless, contractors and vendors who do not need to be on-site to complete their work should be asked to work remotely, and, if working remotely already, should continue to do so if not fully vaccinated.

- If business needs dictate that the vendor must be on-site, the business should first talk to the account manager to request them to staff our account with only fully vaccinated people.

- If the **vendor agrees,** and has an accommodation process acceptable to WarnerMedia, it is possible to register that accommodation in Xempt.

  - The individual must request an accommodation from the vendor, who provides the CV19 Accommodation Team (cv19accommodation@warnermedia.com) with a list of individuals who the vendor determines qualify for an accommodation.  That information will be recorded in Xempt and flow through to the Passcard system.

  - Vendors with approved accommodations will be required to follow minimum mitigation measures of masking, distancing where able and regular testing, at the vendor's cost.  The monitoring of compliance with these requirements is the responsibility of the vendor.

  - In the event of a positive case, the vendor should share any close contacts in the workplace with the primary

business contact. The primary business contact needs to work with their HR partner to notify affected employees.

- If a **vendor does not agree** to WarnerMedia's request to staff on-site needs with only fully vaccinated people, the business may decide to:

  - Deny the vendor on site access, and absorb business consequences (e.g. disruption, contract issues, if any), and find a different vendor who will accommodate our vaccine request

  - Direct the vendor to use the "WarnerMedia Policy does not apply" option in Passcard.

  - In these cases, such individuals are asked to provide their vaccination status, and, if they choose not to share, are considered unvaccinated and must wear a mask and always maintain social distancing. This can be applied to the vendor as a blanket policy or on a case-by-case basis.

**Are off-site events (e.g. team lunches, happy hour, town halls) subject to the WarnerMedia vaccination policy?**

Yes. Employees who are unvaccinated and working remotely who require an accommodation for religious or medical reasons should submit an accommodation request.  Employees with an approved accommodation may be permitted to participate subject to a review of their current accommodation and mitigation measures.

⌄

ACCOMMODATION PROCESS

⌄

COVID-19 VACCINATION REPORTING

⌄

BENEFITS

⌄

COVID-19 VACCINE INFORMATION

# FINAL NOTES ABOUT VACCINATION POLICY

*The COVID-19 vaccine supply is extremely limited in many parts of the world, and distribution procedures vary by region. The Company reserves the right to change this policy at any time in its sole discretion.*

*The Company may, in its sole discretion, facilitate vaccine registration for eligible employees by disclosing to government agencies offering the vaccine confirmation of essential employment and, where required, individual work-related information (name, WarnerMedia user ID, work contact, and work address data) or high-level, non-sensitive personal data reflecting age range (e.g., over 50) or county/city of residence.*

*This Policy will comply with all applicable laws and currently is scheduled to remain in effect until December 31, 2021.*

*The Company reserves the right to amend, change, or cancel individual participation and this policy or any part thereof, or reduce, modify, or suspend terms at its sole discretion. This policy is not a contract, assurance of compensation, continued employment, or benefit of any kind. Where state or local laws differ from this section, the legal requirements prevail.*

*WarnerMedia will not tolerate disparate treatment or retaliation based on vaccination status. Employees shall not ask questions about a person's choice not to get vaccinated.*

# COVID-19 EMERGENCY RELIEF POLICY

The COVID-19 Emergency Relief Policy can be found  here.

Legal and Privacy

Give Us Your Feedback

FAQS



© and ™ 2021. WarnerMedia, LLC. All Rights Reserved. All trademarks are the property of their respective owners.

Case 1:23-cv-05587-JPB-CCB    Document 1-2    Filed 12/06/23    Page 44 of 146

EXHIBIT 4

 **Gmail**

**Scottee LP <scotteelp@gmail.com>**

## Re: Notification Follow Up (Scott Richards)

2 messages

**Richards, Scott** <scott.richards@warnermedia.com>                    Thu, Nov 18, 2021 at 10:18 AM
To: "Davis, Tiffani" <tiffani.davis@warnermedia.com>

Tiffani,

Can you provide a response from HR? If not, I need you to escalate this to your superior at this time.

What does "undue hardship" mean exactly in this context regarding my situation?

I've been waiting for a week now and have not received an answer from you.

I need a definitive answer, and leaving me with no responses to important questions is causing a lot of anxiety for my wife, my kids and myself.

HR hasn't been forthcoming in anyway during this process, and I am being purposefully ignored when asking questions about why Warner Media is discriminating against me.

This week, OHSA has suspended the implementation of this unconstitutional mandate, so now, what does that mean for my situation of employment at Warner Media?

I need responses please.

Thanks in advance!

-S-

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Thursday, November 11, 2021 9:13:57 PM
**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Cc:** Davis, Tiffani <tiffani.davis@warnermedia.com>
**Subject:** Re: Notification Follow Up

Tiffani,

Can you define "undue hardship" for me as it is used by Kristopher, so I can better understand this situation?

-S-

**From:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Sent:** Thursday, November 11, 2021 12:16:16 PM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Cc:** Davis, Tiffani <tiffani.davis@warnermedia.com>
**Subject:** RE: Notification Follow Up

I have responded to your question several times. The company is not able to accommodate an unvaccinated employee in your role because of health and safety risks and operational challenges. While the company considers possible ways to accommodate certain employees who can't be vaccinated, it does not need to do anything that puts an unnecessary burden on the company. In your role the company didn't believe there was an accommodation that met those requirements.

I have copied my manager, Tiffani Davis.

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Wednesday, November 10, 2021 1:19 PM
**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Subject:** Re: Notification Follow Up

I am convince the definition "undue hardship" is outside your role and responsibility of defining, because you continue to use the term without actually defining what it means, specifically.

Can you escalate this request to your manager, as your inability or unwillingness to define it is causing me concern of your involvement in handling this moving forward.

Thanks again!

-S-

**From:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Sent:** Wednesday, November 10, 2021 11:39:30 AM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Subject:** RE: Notification Follow Up

As mentioned in my last note to you, the health and safety risk associated with an unvaccinated employee in your role, which requires on site work in shared spaces and close contact with others poses an undue hardship on the company. We are working on finalizing the details of your separation and severance, which will include information about benefits and next steps. Thanks for understanding that this is an individualized process that takes some time. I'll update you as soon as I have more information for you.

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Wednesday, November 10, 2021 10:14 AM
**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Subject:** Re: Notification Follow Up

Kristopher,

No response? Can we keep a level of professionalism, and at least respond to me?

I will need to know your definition of "undue hardships".

Also the following…

- When will I be provided more information about Warner Media terminating me? Do you know? Maybe there's another more Senior HR person who will respond to my queries. Can you ask your superiors?

- When will my health benefits expire due to Warner Media's unconstitutional move to terminate me based in n vaccination status?
- What are the next steps, and when will I be informed of EXACTLY what those steps will be? Information has yet to be provided with any details regarding a separation package that was previously mentioned. The general description previously provided is insufficient for me to understand fully what HR has planned, so I will need a response.

Thank you so much for your effort, I know how difficult it is to provide excellent service.

-S-

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Thursday, November 4, 2021 12:57:54 PM
**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Subject:** Re: Notification Follow Up

Kristopher,

As an HR Representative, thank you for confirming the contradiction/hypocrisy of the Warner Media COIVD Vaccination Policy; specifically the following passage.

*"WarnerMedia will not tolerate disparate treatment or retaliation based on vaccination status. Employees shall not ask questions about a person's choice not to get vaccinated."*

Legal protections withstanding, I interpret the way in which my case has been handled by HR as me being treated disparately and my termination is not my choice, but the choice of the Warner Media, LLC to retaliate against me based on my Vaccination status, despite my job requirements. Hereto, You are a Warner Media employee, not just asking but, demanding not only that I share my vaccination status to retain my employment, but also receive a medical treatment that goes against my religious beliefs.

My family is pro "ethical" vaccinations, however, my Primary Care Physician and my children's Pediatrician have confirmed that there are no "ethical" alternatives available for any of the COVID vaccinations. If there was an ethical alternative, like there are for the all of the other vaccinations my family and I have received, I would be first in line. However, there are none.

Moreover and most notable, I believe this policy and its implementation is a violation of my civil rights.

Also, you continue use the phrase "undue hardships", however, I've yet to receive any clarification on what that means exactly. Can you explain, in specifics, what are "undue hardships" from the Company's perspective.

Thank you so much for responding! Confirming the time table is most appreciated.

BR,

-S-

**From:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Date:** Thursday, November 4, 2021 at 12:26 PM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Subject:** RE: Notification Follow Up

Thank you for reaching out. I had hoped to speak with you personally about this, and left you a voicemail hoping we could talk, but I understand from you that you'd rather communicate only by email. I'm sorry we weren't able to have the conversation and that as a result the email was the first notification that the company is unable to accommodate your request to return to work unvaccinated.

While you may be eligible to be considered for a reasonable accommodation, the company doesn't believe it can accommodate your request to return to work unvaccinated. The company considered various potential accommodations and mitigation practices, including those you submitted in association with your accommodation request, but has determined that because your role requires on-site work in shared spaces and close contact with others, we could not adequately mitigate the health and safety risk to you and others. Particularly as more employees return to work on-site, enforcing mitigation efforts like masking and social distancing present an undue hardship to operations. While it may have been possible for this work to be done remotely when no other options were available, this is not a remote position. To be performed most effectively the role requires you to be on site.

Accordingly, your role will be posted two weeks from today, November 18, at which time you will be placed on a 4-week paid leave. At the end of your leave, your employment will be terminated and you will be eligible for Severance in exchange for a separation agreement.

Of course, if you are able to be vaccinated at any time, please let me know. If your position is still available, you may be able to return to work. The company will require proof of vaccination.

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Thursday, November 4, 2021 10:28 AM
**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Subject:** Re: Notification Follow Up

Kristopher,

I have some unanswered questions.

Will you respond?

-S-

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Date:** Tuesday, November 2, 2021 at 2:35 PM

**To:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Subject:** Re: Notification Follow Up

Hi Kristopher,

Correction: For the record, you and I didn't speak at any time about any information as you mentioned in your previous email — the previous email is the first time hearing any of that information.

I'm not fully sure understanding the "undue hardship" you mentioned as the reason for not allowing me onsite to perform my job responsibilities that I'm capable of performing. Can you please explain in further detail, so that I can better understand.

Also, you failed to mention the start date of the 2 week transition. My manager and I can assume, but would prefer not to, so we need some clarification from you on that as well.

Thank you so much for your effort on this, I can appreciate how difficult things can be.

Cheers!

-S-

---

**From:** Williams, Kristopher <kristopher.williams@warnermedia.com>
**Sent:** Tuesday, November 2, 2021 1:16:07 PM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Subject:** Notification Follow Up

***PERSONAL AND CONFIDENTIAL***

Scott Richards,

We have carefully evaluated your request for an accommodation that would exempt you from WarnerMedia's vaccination policy. Unfortunately, your request cannot be granted. The company has determined that the essential functions of your role cannot be performed remotely, and allowing an unvaccinated employee to provide services in your role in our facilities and workspaces would present an undue hardship operationally.

As we discussed, you have been granted 2 weeks paid notice during which you should transition your work. During that time, you are also welcome to apply for any open roles for which you are qualified that may be performed remotely or that can be accommodated without presenting an undue hardship operationally. Open roles can be found at Careers at WarnerMedia | WarnerMedia jobs (warnermediacareers.com). Your role will be posted for recruiting at the conclusion of the 2 week notice period, and you will be paid while placed on leave status for 4 additional weeks. Your employment will be terminated as of December 18, 2021.

Case 1:23-cv-05587-JPB-CCB Document 1-2 Filed 12/06/23 Page 49 of 146

WarnerMedia is offering you a separation package that provides Severance and certain benefits in exchange for a signed separation and release agreement. We will provide you with a copy of this documentation for your review shortly.

Please let me know as soon as possible if you have additional information to be reviewed related to your accommodation request, or if your position has changed and you intend to be vaccinated.

Thanks,

**Kristopher Williams**

People Partner | Technology

**C** 404-476-1327

**Warner**Media

---

**Richards, Scott** <scott.richards@warnermedia.com>                    Thu, Nov 18, 2021 at 2:14 PM
To: Scottee LP <scotteelp@gmail.com>

---

-S-

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Thursday, November 18, 2021 2:14:07 PM
**To:** Davis, Tiffani <tiffani.davis@warnermedia.com>
**Subject:** Re: Notification Follow Up (Scott Richards)

I am "vaccinated", just not with Warner Media's required treatment — which is where the unconstitutional discrimination comes into play.

Unfortunately, HR is held by financial "undue hardship" is how this looks from my view.

HR is complicit in this manner, very illegal.

-S-

---

**From:** Davis, Tiffani <tiffani.davis@warnermedia.com>
**Sent:** Thursday, November 18, 2021 11:25:06 AM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Subject:** RE: Notification Follow Up (Scott Richards)

Good Day Scott,

I'm afraid I don't have a different answer for you. The health risk associated with an unvaccinated person in this role can't be lessened without making significant changes to the role, the work environment, and the way we operate. The health risks and operational challenges would be an undue burden to the company.

Thank you,


Tiffani




**Talent Leader - WMTO**

**O. 404-827-4718**

**M. 404-312-6183**

**E.  tiffani.davis@turner.com**


[Quoted text hidden]

EXHIBIT 5

[13:11, 7/15/2021] ScotteeLP: Im kooking forward to our one on one
[13:12, 7/15/2021] Andrue Netcher: Ok
[16:07, 7/15/2021] ScotteeLP:
https://americasfrontlinedoctors.org/legal/vaccines-the-law/
[18:16, 8/9/2021] Andrue Netcher: If you plan on leaving please consider turning in your resignation letter. I don't want you to get burned by anything.
[18:26, 8/9/2021] ScotteeLP: Yessir
[20:03, 8/9/2021] ScotteeLP: This made me curious, what did u mean when u said, "i dont want you to gwt burned by anything?". Ive never said i was resigning. Is someone saying that to u? Thank u for the reference Btw!
[20:05, 8/9/2021] Andrue Netcher: The guys showed me a picture of your cleaned out desk concerned me. My last email about not coming in if you're not vaccinated led me to rhat. BTW, this is NOT my company voice in here.
[20:06, 8/9/2021] ScotteeLP: I cleaned my desk, true.
[20:08, 8/9/2021] ScotteeLP: Bc i always thought the email u sent today could happen at any time now, i wasnt clear if i was gonna be allowed to return to campus until mandate lifted or i get vaxxed or the company considers my request health and religious exemption info -- which  still waiting on. No response from HR yet, which i find very concerning.
[20:09, 8/9/2021] Andrue Netcher: Ok. It took them about three weeks to respond to me an then they told me to contact the insurance company.
[20:09, 8/9/2021] Andrue Netcher: Scott, I am pulling for you to get an exemption. We need you and I want you to stay!
[20:15, 8/9/2021] ScotteeLP: Thank u. Im hoping i can get an exemption. However, my situation, i feel, is not being considered by my employer, and HR is not providing general info, part of their legal responsibility. Im confused on what the literal policy is at this point for vaxx mandate. The company info is incomplete, so I am willing, but unable to make an educated decision about my health and employment until my questions to HR are answered. I told u. Im dedicated, and will leave when Im told to leave.
[20:16, 8/9/2021] Andrue Netcher: I will try to give you any warning before they start saying they're going to fire people. I filled out your recommendation on Zip recruiter then they tried to start sending me jibs
[20:17, 8/9/2021] Andrue Netcher: *jobs
[20:18, 8/9/2021] ScotteeLP: I really do appreciate u Andrue. Thank u
[09:21, 11/1/2021] ScotteeLP: let's see what today brings.....
[16:08, 11/1/2021] ScotteeLP: heard anything?
[16:58, 11/1/2021] Andrue Netcher: Not a word
[14:18, 11/4/2021] ScotteeLP: 2 weeks from today, my position will be posted as open.
[14:18, 11/4/2021] ScotteeLP: PerHR
[14:19, 11/4/2021] Andrue Netcher: So your 2 weeks ends on the 13th?
[14:22, 11/4/2021] ScotteeLP: Negative
[14:22, 11/4/2021] ScotteeLP: Nov 18
[14:22, 11/4/2021] ScotteeLP: 2 literal weeks they said
[14:23, 11/4/2021] ScotteeLP: Then 4 weeks paid leave
[14:23, 11/4/2021] ScotteeLP: Unless i can scoop an internal move to another remote position.
[14:24, 11/4/2021] ScotteeLP: Question for u, couldnt the job description for my current position denote "remote available were permissible"?
[14:25, 11/4/2021] ScotteeLP: Sounds like HR keeps underscoring that point. If the description was different, that may make a difference, but maybe not....juat asking
[14:27, 11/4/2021] Andrue Netcher: Job description can't be changed because then everyone working under that title in the company would have to be given the same opportunity.
[14:28, 11/4/2021] ScotteeLP: Ok

[14:28, 11/4/2021] ScotteeLP: Under the current conditions, wouldnt that be inclusive?
[14:28, 11/4/2021] ScotteeLP: Less pay, salary over hourly?
[14:29, 11/4/2021] Andrue Netcher: I don't know what you mean by inclusive.
[14:33, 11/4/2021] ScotteeLP: Inclusive is the sense that, if one is impacted bc of this mandate for onsite, then one's situation would be accomodated by allowing  remote work, much like Mark Baker was accomodated when covid pandemic started, and Mark relayed to me that he requested to work from unless necessary for on site work.
[14:35, 11/4/2021] ScotteeLP: Mark relayed to me he requested to work from home bc it wasnt safe to come on site, and he suggested I do the same if I dont feel comfortable on site
[14:35, 11/4/2021] ScotteeLP: Of course after the vaxx was released, things started to change
[14:36, 11/4/2021] Andrue Netcher: That has since changed. He now comes onsite to do his tasks as needed. If there is not he needs to be onsite for he can continue to work remotely.
[14:36, 11/4/2021] ScotteeLP: So my accomodation doest apply?
[14:36, 11/4/2021] Andrue Netcher: I don't think we'll ever get back to a 100% onsite workplace but there is still a need to have people able to come onsite.
[14:37, 11/4/2021] Andrue Netcher: That was HR's determination
[14:38, 11/4/2021] ScotteeLP: Yes, but Im feeling casted out bc there are no ethical alternatives to covid jab
[14:38, 11/4/2021] ScotteeLP: This is the rub
[14:38, 11/4/2021] ScotteeLP: If there was an ethical alternative, id get that ethical jab, no fetal cells used
[14:39, 11/4/2021] Andrue Netcher: That's the Pfizer and Moderna
[14:39, 11/4/2021] ScotteeLP: False
[14:39, 11/4/2021] ScotteeLP: My primary care and pediatrician have confirmed they do not exist
[14:39, 11/4/2021] ScotteeLP: I have the docs
[14:40, 11/4/2021] ScotteeLP: Does not exist
[14:40, 11/4/2021] ScotteeLP: My doc is going to let me know when the ethical versions exist. However. None being developed at this time.
[14:41, 11/4/2021] ScotteeLP: So, my civil rights r bwing violatex
[14:41, 11/4/2021] ScotteeLP: Violated*
[14:42, 11/4/2021] ScotteeLP: This is the reality the few realize, Koetter didnt know this either
[14:47, 11/4/2021] Andrue Netcher: What I read said that no fetal cell lines were used to produce or manufacture the Pfizer and Moderna vaccines. J&J did
[14:48, 11/4/2021] ScotteeLP: Andrue, i respect u
[14:48, 11/4/2021] ScotteeLP: But whatever u read is false
[14:48, 11/4/2021] ScotteeLP: Ive been consulted by my family physians

**SCOTT RICHARDS REBUTTAL**

**TO WARNER MEDIA'S POSITION STATEMENT**

**EEOC CHARGE NO.  410-2022-05055**

**6/28/23**

This Rebuttal timely responds to the Warner Media's Position statement dated April 28, 2023.

**I.      Introduction and Synopsis.**

While various assertions are raised in Warner's  10 pages of single spaced typed Position Statement ("Statement"), it should be noted that a great many have already been addressed in Charging Party's[1] Charge Narrative ("Narrative").[2] Warner's argument boils down to three things:  1) Telling Plaintiff to go find another job suffices as granting him  a "reasonable accommodation;" and 2) Accommodating Plaintiff by allowing him to work from home or wear protective gear/social distance, as it had done successfully for the prior 18 months, would be an "undue burden" and therefore Warner would rather fire Plaintiff than give him a religious exemption. Lastly, 3) Plaintiff does not specifically use the word "retaliation" and so there is none.

  **Retaliation and Interactive Discussion.**  Addressing the last point first, the facts set forth speak for themselves and the EEOC is well acquainted with what constitutes retaliation.  Obvious retaliation is demonstrated by the fact that Mr. Richards was fired after engaging in protected activity--i.e., requesting a religious accommodation. **Warner's failure to engage in the legally required interactive discussion supports Plaintiff's retaliation claim**, as well as his other discrimination claims.  Notably, the only time the legal word "interactive" appears in Warner's Statement is in the Exhibit regarding "Reasonable Accommodations (US)" policy, which states:  "Reasonable accommodations are determined, identified, and implemented through a collaborative, interactive process involving you, your

---

[1] Please note that Charging Party will also be referenced as "Plaintiff" herein.

[2] Plaintiff urges the EEOC re re-review his Narrative after reading Warner's Position Statement.  Multiple of Warner's arguments are addressed therein, and many of Plaintiff's most important arguments are not even mentioned much less addressed in Warner's Statement, especially with regard to the "undue burden" issue. Warner ignores completely Plaintiff's discussion of the Adeyeye v. Heartland Sweeteners LLC case, 721 F.3d 444 (7th Cir. 2013) with is extremely helpful to the issues in this case.

manager, and relevant representatives from P&C."[3]  This is not what was received by Plaintiff.  While employers often submit policies written by lawyers to somehow show that they did not engage in discriminatory conduct, a policy unfollowed is worthless as a defense.  What it does show here, however,  is that Warner was aware of its obligation to engage in the interactive discussion required by law but chose to ignore it--there was no interactive discussion with Mr. Richards.

        **Reasonable Accommodation.**  If Warner actually was trying to determine a reasonable accommodation, as is required by law, its officials would have sat down with Plaintiff and discussed how they might jointly achieve what *should have been* a *mutual goal--keeping Plaintiff employed.*  But the facts show that wasn't Warner's goal.  Warner wanted to fire these unvaccinated employees with "de minimis"  trouble and was not going to go out of its way to try to figure out an accommodation for someone who refused to go along with the vaccine program President Biden wanted, and Warner management wanted, and who did so on religious grounds. After all, as Biden repeated over and over in speeches in July and September 2021, this was a **"Pandemic of the Unvaccinated."**  It was their fault--they (the unvaccinated) were the ones causing trouble for everyone else. Warner was not going to take the time to answer Plaintiff's multiple questions regarding what constitutes "undue burden," or explain in any meaningful way why Plaintiff could not continue working with the accommodations that had successfully been in place for 18 months.  Rather than talk to him, answer his questions,  and have an in depth discussion for the purpose of finding a way to continue his employment, it was easier, and preferable, to just fire him--and get rid of another of these "trouble-making" unvaccinated.[4]  Upon information and belief, it appears Warner had determined that it would do its part to punish those causing this pandemic--i.e., as President Biden repeatedly stated around the time Warner developed is vaccine mandate, this was a  "Pandemic of the Unvaccinated" and Warner was not going to tolerate this "senseless" refusal on religious grounds or any other,  and was not going to invest any time helping these

---

[3] A search for "P&C" unearthed no results.
[4] See attached Biden Speeches from July 29, 2021 and September 9, 2021.

people stay unvaccinated.[5] Warner's attitude is even in part demonstrated by the attached email from Daphne Calderon dated August 11, 2021 **encouraging the reporting of "misinformation by employees."** Warner was and is interested in the most "de minimis" time and trouble possible in dealing with these unvaccinated employees. **The EEOC should use its power to gather Warner data regarding how many Warner employees were actually given a religious, or even medical, accommodation, and exactly what analysis went into deciding not to accommodate Mr. Richards.**

## II.     Bottom Line:  No reasonable accommodation was given and it was no "undue burden" to grant one since a reasonable and successful accommodation was already successfully in place.

Plaintiff's bottom line response to Warner's Statement assertions is this: 1) Merely telling Plaintiff to go find another job--especially while knowing there weren't any for his skill set not requiring vaccination[6]--and not raising a finger to assist in this regard--does not constitute providing a "reasonable accommodation."  This is especially so when it is obvious that a reasonable accommodation could have been provided because Warner had been successfully doing what allowed Plaintiff to work in "pandemic" conditions for 18 months.   2) Warner failed and refused to engage in the legally required "Interactive Discussion" and thus must be responsible for the legal consequences of its failure. And 3),  Warner provides no data whatsoever proving that granting Plaintiff a reasonable accommodation would cause it an "undue burden."  Warner is in no position to say, "We can't provide Plaintiff with an accommodation (other than telling him to go find another job) because it would be an undue burden--when they already provided this accommodation without undue burden for 18 months.

---

[5] Warner, as a giant media company, is believed to be an arm of the Biden administration in generating fear of covid in the country and fear of and anger at  those unvaccinated in order to get as many Americans as possible to take the experimental, extremely hazardous or deadly jab.

[6] Warner contends in its Statement, p. 5, that as part of the reasonable accommodation process, "Management and HR also evaluated whether there were any available open roles in which the eligible employee could be accommodated…." If true, apparently, in Warner's opinion, there were none, yet it told Plaintiff to apply for other jobs it knew were not there. Now it claims telling him to engage in this worthless undertaking was a "reasonable accommodation."

3

Finally, 3) the facts show that Plaintiff was retaliated against for requesting a religious accommodation and thereby being part of "the problem" described multiple times by President Biden.  See attached Biden Speech of July 29, 2021. Warner appears to act as Biden's agent in this regard and to view Mr. Richards and others unvaccinated as both troublesome and  "disabled" (in violation of the ADAAA) because they cannot (per Warner's instruction) work around others.

**Preliminary Issues.**

Warner makes a couple of comments in its Statement than Plaintiff cannot allow to go unaddressed.   First, without accusing him outright, Warner insinuates--without a shred of proof or even a factual assertion--that Mr. Richards' religious beliefs are not sincere, and it takes pains to assure us that Warner reserves all rights to challenge his sincerity. [7] Plaintiff frankly finds this assertion insulting and inappropriate, especially in view of both the EEOC and U.S. Supreme Court admonishment regarding challenging an employee's religious beliefs.  In short, as the Supreme Court  has emphasized that, "it is not for us to say that [the plaintiffs'] religious beliefs are mistaken or insubstantial. Instead, our "narrow function ... in this context is to determine "whether the line drawn reflects "an honest conviction… "  Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014). Notably, until Warner filed its Statement, no one at Warner ever suggested Plaintiff's religious convictions were an iota less than sincere.  Thus, the comments inferring that there might be reason to suggest Mr. Richard's "honest conviction" is either not honest or not his conviction, especially without any statement whatsoever with regard to the basis on which such an assertion could be made, is nothing more than a baseless attack on his character.

Adeyeye v. Heartland Sweeteners, LLC, 721 F.3d 444, 452 (7th Cir. 2013)--an extremely relevant case discussed in Mr. Richards' Charge Narrative but inexplicably ignored entirely by Warner in its Position Statement, makes clear many things relevant here.  First, this religious discrimination case makes evident that courts and employers do not get to demand that an employee justify his

---

[7] See, e.g., Position  Statement, f.n. 3, f.n. 4.

4

religious beliefs.   "Inquiring into sincerity is limited to determining if the asserted belief or practice is in fact the employee's own religious belief; it should not entail considering any matters such as whether employee had a true conversion experience or whether the practices are embedded in his cultural and family upbringing." Nor do employers or courts get to determine that one employee's interpretation of his faith is better than another employee's contrary interpretation of that same faith .[8] Accord, _Thomas v. Rev. Bd. of Ind. Emp. Sec. Div._, 450 U.S. 707, 716 (1981) ("**Courts are not arbiters of scriptural interpretation.**"). Emphasis added.[9]  This kind of offensive challenge is the kind of badgering that is a way of retaliating against an employee  for requesting a religious accommodation in the first place.  "We will call you a liar" is extremely offensive and chilling to one whose religious faith is grounded in honesty and truth telling.  Courts and the EEOC have directed that employers and courts tread lightly in determining the sincerity of an employee's beliefs.[10]

### III.    Demonstrating that it has in good faith offered Mr. Richards a Reasonable Accommodation is _Warner's_ Burden of Proof.

**"Encouraging him to apply" and "Offering to Help Him Find Another Job" are two different things.**

"Encouraging"  Mr. Richards to apply for another job, and even giving him

---

[8] The Adeyeye court explained:  "The court is not and should not be in the business of deciding whether a person holds _religious_ beliefs for the "proper" reasons. The court thus restricts its inquiry to whether or not the **religious** belief system is sincerely held; the court does not review the motives or reasons for holding the belief in the first place." Id. at 452.  Also, "A religious belief can appear to every other member of the human race preposterous," yet still be entitled to protection." _Stevens v. Berger_ , 428 F.Supp. 896, 899 (E.D.N.Y. 1977) ; _see also United States v. Ballard_ , 322 U.S. 78, 87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

[9] See https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9546543277761610748655186.

[10] See above citations, and Adeyeye at 453.

5

"additional time" to do so, is not a "reasonable" accommodation.  This required no additional effort on Warner's part.  It already had a system where *anyone* seeking a job, whether for a religious accommodation or not, could use this system to see what jobs were available.  The "additional time" "given" him was the same as Warner was giving everyone as part of its transition process.  Shoe-horning these facts into the definition of "reasonable accommodation" is more than a stretch.

The unjustified assertion that "encouraging" and "giving more time" constitutes a reasonable accommodation in Mr. Richards' circumstances is not much different than the argument the Adeyeye employer, Heartland, wisely, relegated only to a footnote.  The following Adeyeye court quote is instructive on multiple levels:

> Heartland argues, nevertheless, that *any* inconvenience or disruption, no matter how small, excuses its failure to accommodate, **[\*456]**  relying on the language in *Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977),* saying that an **_accommodation_** of religion **_requiring_** anything more **[\*\*27]** than a "*de minimis* cost" creates undue hardship. **Heartland has read too much into this phrase** in *Hardison*. **HN19**[⬆] The Equal Employment Opportunity Commission reads the *Hardison* language as meaning that regular payment of premium wages (such as overtime or holiday wage rates) for substitutes would impose an undue hardship, while administrative costs such as those incurred in rearranging schedules and recording substitutions for payroll purposes would **no**t amount to an undue hardship. *29 C.F.R. § 1605.2(e)(1)*. *Hardison* is most instructive when the particular situation involves a seniority system or collective bargaining agreement, as in *Hardison* itself. Its broad **reference to "more than a *de minimis* cost" should be understood *in this context,*** especially when we consider the Court's strong endorsement of unpaid leave as a reasonable *accommodation* for employees' *religious* schedules, see, *e.g., Ansonia Board of Education, 479 U.S. at 70*, and when we keep in mind both words in the key phrase of the actual statutory text: "undue" and "hardship." Again, **a jury would not be _required_ to find an undue hardship here.**
>
> Finally, we consider Heartland's argument that it did provide Adeyeye with a reasonable **[\*\*28]** *accommodation* in the form of voluntary self-termination with the possibility of being rehired. *Heartland had the good sense to relegate this argument to a footnote. It has little to recommend to it.* We strain to imagine a situation in which such an offer could be considered an *accommodation*, nor could we locate a federal court in the country opining that such an *accommodation* could be reasonable for a **_religious_** request. **HN20**[⬆] *Title VII does not contemplate asking employees to sacrifice their jobs to observe their religious*

6

> *practices.* **At the risk of belaboring the obvious, Title VII aimed to ensure that employees would *not* have to sacrifice their jobs to observe their *religious* practices.** An option of voluntary termination with the right to ask for one's old job later is not a reasonable ***accommodation***.[11]

Case authority cited by Warner in support of its "we gave him a reasonable accommodation" argument is easily distinguished.  For example, the *unpublished* 11th Circuit case of Patterson v. Walgreen Co, Case No. 16-16923 (11th Cir. Mar. 9, 2018), cited extensively by Warner, involved a plaintiff who was a Seventh Day Adventist and thus could not work on Friday night or Saturday, his religious sabbath. In this case, the employer was willing to accommodate plaintiff by allowing him to switch with other employees who could cover for him. When an urgent requirement for Saturday work arose, although several employees had the skills to cover for him, he only contacted one.  When she could not cover for him due to childcare obligations, he advised his supervisor he could not work the required Saturday.  He apparently did not even try to contact the other suitable employees for possible coverage of his shift. Notwithstanding, rather than immediately fire him for not showing up, the employer offered to allow him to return to his prior position or look for another job that had a large pool of employees from which the plaintiff could more easily find employees to switch shifts with him when needed. It is inferred that these types of jobs were available with the company.  Plaintiff insisted Walgreens guarantee he would never have to work on his sabbath,  Friday night or Saturday.  He was terminated due to his demand for a guarantee to never have to work on his Sabbath and his refusal to look for another position that would make it more likely that his unavailability could be accommodated.

The court explained its rational in holding that the employer offered a reasonable accommodation:  "The other side of the equation is that the employee has a "duty to make a good faith attempt to accommodate [his] religious needs through means offered by the employer."" Patterson v. Walgreen Co., No. 16-16923, at *9 (11th Cir. Mar. 9, 2018).  In other words, the court apparently felt that the employer tried to help the employee, but the employee refused to cooperate and make an effort to make the offered arrangement work.

This is not the case in the present case.  Warner admits that Plaintiff indeed made several attempts to find another job that did not require vaccination.

---

[11] Adeyeye at 455-456. Some emphasis added.

7

Statement at 7.   Unlike in the cases Warner cites in support of its claim that it provided a reasonable accommodation, Warner did not offer to help him find another job. Warner cites these cases as holding, "we are persuaded that *offering to help* [the plaintiff] apply for a new position is a reasonable accommodation [under Title VII]"); *Patterson*, 727 Fed. Appx. at 586 (duty to accommodate was met "by encouraging the employee to obtain other employment within the company . . . **_and offering to help_** him find another position").  See <u>Walden</u>, 669 F.3d at 12794 or <u>Jean-Pierre v. Naples Cmty. Hospital</u>, Case No. 19-14286 (11th Cir. June 12, 2020)[12] It really did nothing, notwithstanding its allegation of a complicated process developed to determine if an accommodation could be offered.  See Statement at 5-6 and discussion infra.  **Warner offered Plaintiff no way to continue working**, even though it knew it had a way Plaintiff could continue working:  he had been working successfully from home and with trading shifts when in-person work was required for many months during the "pandemic."  It cost Warner nothing, and all tasks needed were accomplished.

Even though Plaintiff cooperated in every way possible,  Warner offered no legitimate reason this arrangement could not continue, and simply did nothing but dodge his questions and fire him.   Any increased workload would not have negatively been implicated by the arrangement Plaintiff had been using throughout the "pandemic."   Further, the fact that so many employees and others at Warner were NOT required to be vaccinated, blaming on supposed required identical treatment its refusal to do anything to help Plaintiff continue working without giving up his religious beliefs is spurious.   If it could allow others to work unvaccinated, it could have, in the name of legally required respect for his religious convictions,  allowed Plaintiff to work unvaccinated.  Upon information and belief, the others unvaccinated did not even ask, for religious reasons, to remain outside the demands of the mandate.  Warner just did not or could not make its mandate applicable to them (e.g., the mandate was not applicable to vendors, union employees, business operations personnel).  They were just required to mask and social distance, which had worked well for all months prior to the vaccine mandate and continued to work adequately for those not covered by the mandate.

Warner attempts to assert, in essence, that it actually had a detailed process

---

[12] In <u>Jean-Pierre v. Naples Cmty. Hosp</u>., No. 19-14286 (11th Cir. June 12, 2020), cited by Warner, the employer at least offered the plaintiff a per-diem position without benefits--it allowed him to continue working in some way.

for carefully analyzing each employee's circumstance to determine whether it could offer them their requested accommodations.  See Statement at p. 4-5.  It is specious to think that this deep, in-depth process supposedly designed to do the right thing with regard to religious or medical accommodation requests was developed without giving one thought to the requirement of an interactive discussion, even though the interactive discussion is required by both law and Warner's own policy. Also telling is that, despite this alleged process, not one iota of data resulting from this process has been submitted to show all the careful analysis allegedly done on behalf of Mr. Richards request for religious accommodation.  **The EEOC should use its power to obtain all this information, if there is any, before ruling on this matter.**

**Medical Advice?**  Warner also asserts that its actions were merely a result of following and relying on medical advice.   The credibility of reliance on medical advice withers when the company applies it to some employees (some are not allowed to work closely with others) but not others (many others were allowed to continue working with others *without* vaccination).  Warner so advised everyone that there were vaccinated and unvaccinated all mingling together in the company, e.g., in the cafeteria and other common areas. [13]  During the March 2020 and through the November 2021 period, concern for working around others was adequately handled and, upon information and belief, no one became ill or died

---

[13] See Narrative at 3 and Exh. 1 thereto.  Further, it appears that Warner negligently relied on medical advice, if that medical advice advised that some, but not all, employees must be vaccinated with an experimental, proven to be dangerous "vaccination." Sound medical advice does not require employees to accept significant risks of death or disability, especially with regard to a virus that is generally almost 99% survivable.  See Narrative, n. 2, p. 2.  And the U.S. Constitution and Georgia law prohibits requiring an employee to inject anything into his body that he does not want.  The vaccine mandate was improvidently (negligently) implemented given the information of extensive death and disability published by the CDC VAERS report, and that fact that both the Director of the CDC, Rochelle Walensky, and a senior Pfizer executive publicly admitted that the vaccine does not "stop the spread" of the virus.  CDC Director Rochelle Walensky admitted to Congress on July 30, 2021--before Warner's vaccine mandate-- that the vaccine did not stop the spread--both vaccinated and unvaccinated could transmit the Covid virus. https://www.cdc.gov/media/releases/2021/s0730-mmwr-Covid-19.html (last visited 5/2023); A similar admission was made by a high-ranking official of Pfizer. See disturbing article from apnews.com re same: https://apnews.com/article/fact-check-pfizer-transmission-european- parliament-950413863226 (last visited 5/20/23) stating that Pfizer never said it stopped transmission, and in fact, **in a Dec. 22, 2020, press release, the FDA said, "there is no evidence the vaccine prevents transmission…person to person."**  Given this reality, mandating an extremely risky, often deadly, experimental vaccine is senseless and negligent.

from covid.  If it was possible to handle it during that time period, it was possible to handle it after November 2021 for Mr. Richards and others who had religious accommodation requests.

Finally, if Warner were indeed tuned into medical advice, medical information demonstrates that it was negligent in issuing the vaccine mandate in the first place and putting its thousands of employees at risk of death or serious disability.  There was plenty of information issued by the CDC/FDA and other government agencies demonstrating the extreme physical safety risk that would result in consequence of a vaccine mandate.  See Narrative, p. 2, Note 2.  While perhaps conflicting with other information urged by the same agencies, Warner had a duty to investigate the hazards of the permanent, experimental substance it was trying to force into the arms of its thousands of employees via threat to their employment and give them without penalty an option to decline the injection.

**Burden of Proof.**  Warner declares incorrect Mr. Richards' statement in his Charge Narrative that "Employer must prove in this case that ANY accommodation at all would cause Employer 'undue hardship….'"[14]  Indeed, Warner is legally obligated to offer SOME accommodation.  Warner misconstrues Plaintiff's statement.  The law is that it is the employer's burden to prove it offered a reasonable accommodation or prove that it would suffer an undue burden by doing so.   In contradiction to Warner's assertion, the Adeyeye v. Heartland court makes clear:

> Heartland bears the burden of proof, so it must show, as a matter of law, that **any and all accommodations would have imposed an undue hardship.** *42 U.S.C. § 2000e(j)*; *Baz v. Walters,* 782 F.2d 701, 706 (7th Cir. 1986).

Warner cannot escape its burden of proof, despite the fact that it is a heavy one.

**THE "UNDUE BURDEN" ANALYSIS IS CURRENTLY BEFORE THE U.S. SUPREME COURT.**

After 50 years of employers and courts misconstruing the "de minimis" language first set forth by the U.S. Supreme Court  in TransWorld Airlines, Inc. v.

---

[14] See Position Statement at 8.

Hardison[15]--which misconstruction has been much to the detriment of the religious rights of employees[16] and caused much unnecessary trouble and expense--the U.S. Supreme Court had accepted for review the case of Groff v. DeJoy[17]. Attached is the Supreme Court Bulletin's analysis of Groff v. DeJoy, which was accepted for certiorari in January 2023. This Bulletin summarizes the arguments made by counsel for both Plaintiff and Defendant. Oral argument was had in the Supreme Court in April 2023, and a ruling is anticipated **by the end of June 2023.** The parameters of what actually constitutes "undue hardship" will hopefully be clarified at that time. Consistent with Adeyeye, discussed *supra.* and in Plaintiff's Narrative, Plaintiff has asserted that "undue burden" means just what it says in the ADAAA, USERRA, and FLSA--i.e., "significant difficulty or expense" or, under bankruptcy law, "intolerable difficulties." As can be seen in the attached, many groups, including religious organizations and a collection of twenty two states, support Groff's (plaintiff's) position.

**CONCLUSION**

For all the above reasons, the EEOC should investigate thoroughly all the possible violations of law described in this Rebuttal as well as all other documents Plaintiff has submitted; should find cause to believe Mr. Richards has unfairly been discriminated against in myriad ways; and do all things within its power to remedy the wrong that has occurred to Mr. Richards at the hands of Warner.

Respectfully submitted,

[SIGNATURE ON FOLLOWING PAGE]

---

[15] 432 U.S. 63.

[16] See discussion in Adeyeye v. Heartland Sweeteners, supra., which recognized that the arguments set forth by the employer there and here by Warner were misconstrued under the "de minimus" language set forth in Hardison, and that Hardison should be limited to its particular facts. Finally, the U.S. Supreme Court has decided to consider this language in the context of a USPS worker requiring Sundays off for religious reasons.

[17] Groff v. DeJoy, No. 22-174 (U.S. Jan. 13, 2023)

HIPES LAW LLC

Jeanne Bynum Hipes
Counsel for Charging Party,
Scott Richards

Enclosures:

Biden Speech of 7/29/21

Biden Speech of 9/9/21

Email thread from Daphne Calderon dated August 11, 2021 encouraging the reporting of "misinformation by employees."

Supreme Court Bulletin's analysis of Groff v. DeJoy,

12

JULY 29, 2021

# Remarks by President Biden Laying Out the Next Steps in Our Effort to Get More Americans Vaccinated and Combat the Spread of the Delta Variant

East Room

4:23 P.M. EDT

THE PRESIDENT:  Good afternoon. Today, I want to talk with you about COVID-19.

Maybe the best way to start is: In a significant part of the country, you wouldn't have to take one of these off, you don't have to put one on — like in my home state of Delaware, where I lived in New Castle County, where I was yesterday in Pennsylvania — because people got vaccinated.  They got vaccinated.  They don't need a mask when the majority — the vast majority of people got vaccinated.

Now, look, I want to talk about what's really happening — what it means, what it doesn't mean, and what we need to do this week and the months ahead.

From the moment I was elected, I said I'd always give it to you straight from the shoulder, and we need some straight talk right now.  Because there's a lot of fear and misinformation in the country, and we need to cut through it with facts, with science, with the truth.

So, what's really happening today?

After months and months of cases going down, we're seeing a spike in COVID cases.  They're going up.  Why?  Because of this new form, this new variant called the "Delta variant."

This is a much different variant than the one we dealt with previously.  It's highly transmissible, and it's causing a new wave of cases in those who are not vaccinated.

Our experts tell me that cases will go up further
before they start to come back down.  But while cases are on the rise, they're not — we're not likely to see, according to experts, a comparable rise in hospitalizations or deaths in most areas of the country.

So, you have to ask yourself: Why is that?  Because 164 million Americans are fully vaccinated, including 80 percent of those most vulnerable — our seniors.

So, there's a challenge, as we knew there could be.  But there's also good news.

We've spent the last six months preparing for this possibility.  The vaccines are highly effective.  We have enough vaccine for everyone to get vaccinated.

And thanks to the American Rescue Plan and the hard work of the American people, we've administered over 325 million vaccination doses in the past six months.

We have the tools to prevent this new wave of COVID from shutting down our businesses, our schools, our society, as we saw happen last year.

I've said from the beginning that we will be guided by the science. So here's what the science tells us:

On Tuesday, the Center for Disease Control and Prevention — the CDC — announced its new mask recommendation in parts of the country where COVID cases are substantially high, where people didn't get vaccinated — which they define as 50 new cases for every 100,000 people in a week.

The CDC recommends you wear a mask when you're in public and indoors, like work or in a grocery store. That's true for both the vaccinated and the unvaccinated. Why? Because even if you've been fully vaccinated and protected from severe illness from

COVID-19, you could have the Delta variant in your system and spread it to someone who isn't vaccinated.

We need to wear masks to protect each other and to stop the rapid spread of this virus as we work to get more people vaccinated.

And I hope all Americans who live in areas with substantial or high case rates will follow the mask guidance that's being laid down by the CDC.  I certainly will.  And I have — because this is one of those areas, in Washington.

And at my decision — at my direction, all federal personnel and visitors to federal buildings will have to do the same thing.

As I've said from the beginning, a mask is not a political statement; it's about protecting yourself and protecting others.  Masking is one defense against the spread of COVID-19.

But make no mistake: Vaccines are the best defense against you getting severely ill from COVID-19 — the very best defense.

And you want to know how we put this virus behind us?  Well, I'll tell you how: We need to get more people vaccinated.

Look, and it's important to understand what vaccines do and what they don't do.  Put simply, the vaccines are designed to save lives and prevent severe illness.  They're highly effective at both.

A hundred and ninety million Americans have had at least one shot. Of that group, about 90 percent are done now, and 10 percent are waiting for the second shot.

To those folks who have one shot but not the second: Go get the second shot. Even if you're overdue for the second shot, it is not too late.  Go get the second shot now.  Now.

The bottom line is: If you're fully vaccinated, you're highly protected from COVID-19.  But I also know that many of you who are vaccinated are concerned about what's called "breakthrough cases."  Yes, some fully vaccinated people will still test positive, and some will show some symptoms of

COVID-19.  That's expected with almost every vaccine there is for other diseases.

But breakthrough cases remain rare and almost all are mild cases.  In fact, virtually all hospitalizations and deaths are among the unvaccinated.

I also know many of you are wondering if you'll need a booster shot to add another layer of protection.  As of now, my medical advisors say the answer is no.  No American needs a booster now.

But if the science tells us there's a need for boosters, then that's something we'll do.  And we have purchased the supply — all the supply we need to be ready if that was called for.

Folks, the truth is, as more people get vaccinated, we are better protected as a nation to continue reopening safely and responsibly.

But we are not fully out of the woods yet, because what is happening in America right now is a pandemic — a pandemic of the unvaccinated.  Let me say that again: It's a pandemic of the unvaccinated.

There are about 90 million Americans who are eligible to get the shot but haven't gotten it yet.  As I just mentioned, nearly all of the cases, hospitalizations, and deaths due to COVID-19 today are from unvaccinated people.

Last month, a study showed that over 99 percent of COVID-19 deaths had been among the unvaccinated — 99 percent.  This is an American tragedy.  People are dying and will die who don't have to die.  If you're out there unvaccinated, you don't have to die.

Read the news and you'll see stories about unvaccinated patients in hospitals.  As they're lying in bed, dying from COVID-19, they're asking, "Doc, can I get the vaccine?"  And the doctors have to say, "Sorry, it's too late."

Right now, too many people are dying or watching someone they love dying and saying, "If I just got vaccinated, if I just..."  It's heartbreaking.  And it's complicated even more because it's preventable.

America is divided between the

majority of eligible people who are vaccinated and those who are not. And I understand that many of you in the majority are frustrated with the consequences of the failure of the minority to get vaccinated.

But I want you to know that I'm going to continue to do everything I can to encourage the unvaccinated to get vaccinated. That includes addressing hesitancy and misinformation head on.

For example, I know some of you are — who are unvaccinated think, "The development of vaccine was rushed, therefore I'm not going to take a chance. As a result, I think it's not safe because it was rushed." I understand.

But let me explain. Our top scientists at the National Institute of Health — the NIH — and across the country got to work applying decades of research — decades of research — let me repeat that: decades — that have already been done — the research — to develop the COVID-19 vaccine when it hit.

In the last six months, more than 325 million doses of the vaccine have been administered in the United States and

billions of doses administered around the world.  The vaccine was developed and authorized under a Republican administration, and has been distributed and administered under a Democratic administration.

The vaccines are safe, highly effective.  There's nothing political about them.  Look at all the people who took a shot at it.  They later — we learned a lot of them have already been vaccinated.

From the start, I have to compliment Republican Senate Minority Leader Mitch McConnell.  He hadn't made it political.  He's encouraged people to get vaccinated and is continuing to do so, and his state is in pretty good shape.

Alabama Republican Governor Kay Ivey recently spoke out to encourage vaccination.

And even the commentators on Fox who have been belittling this for a long time — some haven't, but many have — are arguing, "Get vaccinated."

Look, this is not about red states and blue states.  It's literally about life and death.  It's about life and death.  That's

what it's about.

You know — and I know people talk about freedom. But I learned, growing up at school and from my parents, with freedom comes responsibility. Your decision to be unvaccinated impacts someone else.

Unvaccinated people spread the virus. They get sick and fill up our hospitals. And that means if someone else has a heart attack or breaks a hip, there may not be a hospital bed for them.

If you're unvaccinated, you put your doctor and nurses at risk — the same frontline, essential workers who put their lives on the line over the past year and have gone through hell.

Again, with freedom comes responsibility. So, please, exercise responsible judgement. Get vaccinated — for yourself, for the people you love, for your country.

 I'm being literal when I say this: As I travel the world, almost every day a foreign leader calls me, asking can I provide his or her country more vaccines. Their people are desperate for vaccines.

I'm doing everything to answer those calls.  We're sending millions of vaccines to people around the world.  But, folks, it's an American blessing that we have vaccines for each and every American.  We've made it our first and top priority to have available vaccines for every eligible American and that's never going to change as long as I'm here.

And it's a shame — it's just such a shame to squander that blessing.  That's why after six months of extraordinary work and effort, today I'm laying out additional steps we should be taking to deliver these lifesaving vaccines to more Americans.

First, we're going to provide more incentives to encourage unvaccinated Americans to get vaccinated.  That starts with paid leave to get the shot.  We're still hearing that people are unable to get time off from their employer to get vaccinated.   Well, this is unacceptable.

For some time now, I've said you should be able to get the shot and still get paid.  Thanks to the American Rescue Plan, the federal government is fully reimbursing any small- or medium-

sized business that provides workers with paid time off to get vaccinated.

Employers, this costs you nothing.  If you haven't given employees paid time off, do it now, please.

Today, I'm announcing that we're taking this a step further.   The federal government will now reimburse those employers to give their staffs — who give their staffs time off not only to get themselves vaccinated, but also to get their family members vaccinated.

That means employers can get reimbursed if they give parents time off — with paid time, paid leave — to take their kids or their own parents to get vaccinated.  So, I'm calling on all ~~employees~~ [employers] across the country to give paid time off to get the shot or to help a family member do so.  I promise you: It will cost you, the employer, nothing.  You'll be reimbursed.

Secondly, I'm announcing that we'll continue the work — to work with states to encourage unvaccinated people to get vaccinated.  In February, the grocery store chain Kroger's offered $100 to their associates if they'd get

vaccinated.  And it worked.  Vaccination rates moved up from 50 cent [sic] — 50 percent to 75 percent among their employees.

States like New Mexico, Ohio, and Colorado are offering similar incentive programs that have helped increase vaccination rates.

So, today, I'm calling on all states and local governments to use funding they have received, including from the American Rescue Plan, to give $100 to anyone who gets fully vaccinated.

I know that paying people to get vaccinated might sound unfair to folks who've gotten vaccinated already, but here's the deal: If incentives help us beat this virus, I believe we should use them.  We all benefit if we can get more people vaccinated.

But in addition to providing incentives to encourage vaccination, it's time to impose requirements on key groups to make sure they're vaccinated.  (Clears throat.)  Excuse me.

Just this week, we took an important step to protect our veterans.  Like many civilian hospital systems are doing, the

Department of Veterans Affairs will now require COVID-19 vaccines for doctors and nurses and other healthcare workers who provide medical care for our veterans.

We must do everything possible to protect our veterans from getting COVID when they come to get medical care they so richly earned serving their country. We owe them.

Next, since many vaccinations are required for active duty military today, I'm asking the Defense Department to look into how and when they will add COVID-19 to the list of vaccinations our armed forces must get.

Our men and women in uniform who protect this country from grave threats should be protected as much as possible from getting COVID-19.

I think this is particularly important because our troops serve in places throughout the world, many where vaccination rates are low and disease is prevalent.

Next, every federal government employee will be asked to attest to their vaccination status. Anyone who does

not attest or is not vaccinated will be required to mask no matter where they work; test one or two times a week to see if they have a — they have acquired COVID; socially distance; and generally will not be allowed to travel for work.

Likewise, today, I'm directing my administration to take steps to apply similar standards to all federal contractors.  If you want to do business with the federal government, get your workers vaccinated.

Look at the Chamber of Commerce representing tens of thousands of American businesses.  The National Association of Manufacturers.  The Business Roundtable, which is comprised of the largest and biggest corporations in America.  They're all applauding the actions the federal government is taking, and I urge them to follow suit.

I also commend the National Football League that has announced that if there are outbreaks among unvaccinated players and personnel, then the team risks forfeiting games.  I urge other sport leagues at every level to take every step they can.

Every day, more businesses are implementing their own vaccine mandates.  And the Justice Department has made it clear that it is legal to require COVID-19 vaccines.

We all want our lives to get back to normal, and fully vaccinated work places will — will make that happen more quickly and more successfully.  We all know that in our gut.  With incentives and mandates, we can make a huge difference and save a lot of lives.

I also want to speak to families with children in school.  We can and we must open schools this fall full time.  It's better for our children's mental and emotional wellbeing, and we can't afford another year out of the classroom.  Every school should be open, and we're giving them the tools to be able to do so safely.  Even in those areas where they have a higher vaccination — they have a higher rate of COVID.

Through the American Rescue Plan, we've provided schools billions of dollars to implement safety measures: better ventilation, social distancing, and

other measures.

In March, when vaccinations were scarce, I prioritized teachers and school workers by utilizing our Federal Pharmacy Program.  Almost 90 percent of educators and school staff are now vaccinated.

Additionally, the CDC has provided clear guidance on how all schools can safely protect the kids and bring them back to the classroom: every student wear a mask.  It's that simple.

So, we've funded safety measures at schools, we've vaccinated teachers and staff, and we can mask up our kids for further protection.

But once again, there's one more thing we need to do: Get more adolescents, ages 12 and up, vaccinated now that they've been cleared.  In the past week, the good news is we're seeing the average number of 12- to 17-year-olds getting vaccinated go — increase 22 percent per day.

Today, I'm asking school districts to host one last pop-up vaccination clinic over the coming weeks for kids ages 12

and up.  We're directing the Federal Pharmacy Program to help make that happen.

Parents, get your children vaccinated. You do it for so many other things right now.

And for kids under 12, if and when the vaccines are deemed safe for them, we'll be prepared to get the vaccines administered as quickly and as safely as possible.

Look — and as we work to vaccinate more Americans, we're prepared for outbreaks in areas of — where there are unvaccinated people.

My administration has made it clear to every governor that more federal resources are available to them.  This includes the deployment of surge teams composed of ex- — experts from the CDC and the Federal Emergency Management Agency — the FEMA.

We're going to continue to provide states with more testing, treatments, protective equipment, personnel, mobile vaccination clinics to stem the surge of the virus among the unvac- —

unvaccinated.

The pictures of hospitals in several states overloaded with patients is unnecessary, avoidable, and tragic.  You know, we'll help any health system overloaded and unable to cope with a spike in cases.  We're ready to do that.

Let me close with this: If you're at home and vaccinated but anxious or even angry, or if you're at home and unvaccinated, unbothered and unconvinced, let's step back and see where we are.

Just remember how we've emerged from a dark winter into a hopeful spring and summer.  But really remember just how dark that winter was.

Over 3,600 Americans were dying each and every day.  And now, even with the surge among the unvaccinated, we're down to that — 300 Americans a day. Significant.

Millions of people were out of work, out of homes, out of hope, and going hungry.  Remember those long lines of people in their automobiles waiting for

a box of food to be put in their trunk?

Experts and pundits said we couldn't get the vaccines. And even if we could get the vaccines, we couldn't get them in people's arms and couldn't get them vaccinated. They predicted our economy would collapse. But remember how we stayed focused and how we went to work?

In six months, we got 164 million Americans fully vaccinated. And because we vaccinated so many people, put in place so many safety measures, and got economic help to businesses and people most in need, our economy is recovering.

More than 3 million Americans are back to work since I was sworn in — a faster job growth than any previous administration. Any.

We're experiencing the fastest economic growth in nearly four decades. The best in the world as of now.

In fact, today's GDP numbers show that in the first half of the year, our economy grew faster than any point in nearly 40

years.  Our economy grew more in six months than most Wall Street forecasters expected for the entire year before we implemented our plan.

And just yesterday, we announced a bipartisan infrastructure deal that's going to continue this momentum over the long term by making the most significant investment to rebuild America in nearly a century.

But we still have to face many challenges.  We still have a lot of work to do as we readjust to a post-pandemic economy.  But we have the right plan.  We're coming back.  We just have to stay ahead of this virus.

I know this is hard to hear.  I know it's frustrating.  I know it's exhausting to think we're still in this fight.  And I know we hoped this would be a simple, straightforward line, without problems or new challenges.  But that isn't real life.  We're coming out of the worst public health crisis in 100 years, the worst economic crisis since the Great Depression.

As I told you before, I carry a card in my pocket — I hope I have it with me — I

have — carry a card in my pocket with the number of Americans dead from COVID-19. As of today — this morning — the total deaths in the United States were 609,441. Granted, the death rate per day is way down; it's down to 400, about, dead.

But that's more deaths than World War One, World War Two, Vietnam, 9/11, Iraq, and Afghanistan wars combined. This is as tough as it gets.

We're Americans. When we get knocked down, we get back up. That's who we are. That's what we do. That's why there's no nation on Earth like us.

And we're prepared like never before. We have the tools to save lives, to keep our economy growing and growing and going.

After the past six months, following the science, we know we can dramatically lower the cases in this country. We can do this. We brought our economy back to life, and we kept it going. We know we can send our kids back to school. We know we can beat this virus. We can do this. We all just have to do our part.

My fellow Americans, this nation has never failed when we have come together as the United States of America.  So I say to all those who are unvaccinated: Please — please get vaccinated.

And to the rest of America: This is no time to be despondent or let our guard — our guard down.  We just need to finish the job with science, with facts, with the truth.  And together, as Americans, we're going to be able to beat this.

May God bless you all.  May God protect our troops.  Thank you.

Q   Mr. President, how long do you think it might be necessary to wear masks?  And at what point do you think people might have to have a booster shot?  Thank you.

THE PRESIDENT:  I said it in my talk: The booster shot is not needed now.  It is possible that it will be needed later.  I don't know — they don't — the science hasn't dictated that yet.  And the fir- — first part of your question?

Q   How long do you think people might have to wear a mask again?

THE PRESIDENT:  Well, if you notice, a lot of places, people don't have to wear masks.  Let's get that straight.  The places where people have gotten vaccinated, where we have a high vaccination rate, people do not have to wear a mask at all.

Like some of you were with me yesterday when I was up in Lehigh Valley.  Didn't have to wear a mask there.  Don't have to mask if you come home to Delaware with me — I know you love doing that.  But you don't have to wear a mask.  The places people are probably going to have to wear masks: in those communities where the high rate of unvaccinated stays high and they don't move — they don't move to getting vaccinated.

But I think you're going to find the patience of businesses and the patience of a lot of other people running thin.  Because the fact is, if you had high vaccination rates, you — we wouldn't be in the spot right now.

Yes.

Q   Mr. President, will this set up a — an American workplace for federal workers and private sector that really is the vaccinated versus the unvaccinated?  And is that a pressure you're trying to harness now?

THE PRESIDENT:  Well, no, I'm not — look, what I'm trying to do is keep people safe.  I mean that sincerely.

So, if in fact you're unvaccinated, you present a problem to yourself, to your family, and to those with whom you work.  Because as pointed out — I was asked the question about, "Why would people who have already been vaccinated get it?"  Well, you got anywhere from 2 to 3 percent, on average — the last study done — that can still get COVID.  They don't get very sick.  They don't get hospitalized.  It's not serious, but they can catch it.

And the concern is they may be able to pass it on.  And so, that's all being studied right now.  But it's important — thing is, if people are vaccinated, the transmission rate drops through the floor.  And that's all we're trying to do.

Yes.

Q   Mr. President, thank you.  Why not push for vaccine mandates in states, private companies, schools?  Do you want to see those entities pass vaccine mandates?

THE PRESIDENT:  Well, I — I'd like to see them continue to move in that direction, and that's why I point it out. I had asked the Justice Department to determine whether that is — they're able to do that legally, and they can. Local communities can do that.  Local businesses can do that.

It's still a question whether the federal government can mandate the whole country.  I don't know that yet.

Q   Mr. President, you said, earlier this week, that we are not headed back towards lockdowns.  But if the science is evolving, how can you be so confident in that?  You heard — we heard you saying, weeks ago, that "the virus [was] on the run," but Dr. Fauci has also indicated that we are headed in the wrong direction.

THE PRESIDENT:  Well, look, you're

take — you're literally correct on everything you said, but it doesn't make — come to the conclusion you're implying.

It is clear that if everybody is vaccinated, the existing vaccines work to prevent death, serious illness, hospitalization. Okay? If every — so, if tomorrow I can wave a wand and every American was vaccinated, then in fact we'd be out of the woods.

Now, can something else happen a year from now? Can there be a different virus? Can there be something? It's possible. But I'm talking about COVID and the existing variants that have come forward so far.

So, it makes a — it's a simple proposition: If you're vaccinated, you find yourself in a situation where you are — highly unlikely, even if you somehow get the virus; very small percentage do — that you are not going to be hospitalized, you're not going to be on a ventilator, you're not going to be sick, but you could be in a position to possibly spread it to someone who wasn't if you have it in you.

Yes.

Q   Mr. President, thank you.  I wanted to ask: Why not require that the people show proof that they're vaccinated?  And also, if you could just — with the 4 million, how much of an impact do you think this will have?  Do you have a projection, sir?

THE PRESIDENT:  A projection on what?

Q   On how many people will get vaccinated by putting in this system?

THE PRESIDENT:  No, I can't — I'm not going to get in business of projecting — I — exactly how many people are likely.  All I know is that we go through these periods, then we run up against a wall, then something happens where people realize, "Oh, my lord, this is really a problem," and they begin to see things.

Look, the fact that a lot of your friends are now saying, "Get vaccinated," who were — before were saying, "This is not a problem.  This is all a Democratic thing."  With a small "d" and a capital "D."  I mean, there's a lot changing.

People are becoming aware.  The more aware they become, then we have these surges of people going out and getting vaccinated —

Q   But what about requiring proof —

THE PRESIDENT:  — and it just keeps building.

Q   I'm sorry, sir.

THE PRESIDENT:  What about what?

Q   What about requiring proof, sir?

THE PRESIDENT:  Well, that is — there's two ways to do it, and I think you're going to see some institutions doing that.  Like you're going to fly abroad, you got to — you're going to have to have proof.  You're not just going to be able to say, "Yeah, I got tested."  You got to pri- — provide proof.

My guess is: If we don't start to make more progress, a lot of businesses and a lot of enterprises are going to require proof for you to be able to participate.

In the back.  And then I'm going to take

off, shortly here.

Q   What further actions are you going to take to encourage private businesses to follow this type of model to either require vaccines or require testing or other preventative procedures?

THE PRESIDENT:  I just did.  And I'm going to keep at it.  I'm going to be talking about it around the country.  I'm —

Q   Are you — but are you going to reach out to private businesses, meet with them, try and actively encourage them to follow this model?

THE PRESIDENT:  Well, I have.  That's why we have folks from the — everyone from the Chamber of Commerce to the manufacturers, et cetera.  So, you know, I am — am I going to call a meeting of every, you know, business in the country to come to Washington?  And — or go on —

I have made the case repeatedly.  I doubt whether there's a single, solitary business that doesn't understand that I think I think it's smart for them to require testing, require — and if you —

if you can't demonstrate, you can't prove you've been vaccinated, you have to be tested.

Q  Secretary Austin said he was already considering mandating —

THE PRESIDENT:  Yep.

Q  — the vaccine after it was fully approved.  Would you like to see the mandate go into effect before full approval?  And do you think he's open to that?

THE PRESIDENT:  I know he's open to it.  And the question is: When is the right time to get the most bang for the buck when you do it?  A lot of this is timing.  And so, I think it's going to happen, but I — look, the one thing that you all are politely and appropriately referencing is that it's still a temporary approval.  So when does the final approval come?  It usually takes a lot of — a lot of work to get — to get there.

I made a commitment I would not tell anyone in the Justice Department who they should prosecute and I would not tell the health industry that they — excuse me, the government health

entities what they should say and do. But my expectation is they're going to reach that conclusion in the early fall.

Thank you very much.

Q   Mr. President, one more.  Mr. President, you said — Mr. President, you said — Mr. President, you said, "If you are fully vaccinated, you no longer need to wear a mask."  And it seems —

THE PRESIDENT:  No, I didn't say that.

Q   You did.  I have the quote.

THE PRESIDENT:  I said if you're fully vaccinated in an area where you do not have — well, let me clarify it.

Q   In May, you made it sound like a vaccine was —

THE PRESIDENT:  Well, in May, that's true.

Q   — the ticket to losing the mask forever, and it —

THE PRESIDENT:  That — that is true at the time, because I thought there

were people who were going to understand that getting vaccinated made a gigantic difference. And what happen was: A new variant came along, they didn't get vaccinated, it was spread more rapidly, and people — more people were getting sick. That's the difference.

Q   How is the First Lady, sir?

THE PRESIDENT:  I'm going to find out in a minute. That's why I'm leaving.

5:01 P.M. EDT

SEPTEMBER 09, 2021

# Remarks by President Biden on Fighting the COVID-19 Pandemic

5:02 P.M. EDT

THE PRESIDENT:  Good evening, my fellow Americans.  I want to talk to you about where we are in the battle against COVID-19, the progress we've made, and the work we have left to do.

And it starts with understanding this: Even as the Delta variant 19 [sic] has — COVID-19 — has been hitting this country hard, we have the tools to combat the virus, if we can come together as a country and use those tools.

If we raise our vaccination rate, protect ourselves and others with masking and expanded testing, and identify people who are infected, we can and we will turn the tide on COVID-19.

It will take a lot of hard work, and it's going to take some time.  Many of us are frustrated with the nearly 80 million Americans who are still not vaccinated, even though the vaccine is safe, effective, and free.

You might be confused about what is true and what is false about COVID-19.  So before I outline the new steps to fight COVID-19 that I'm going to be announcing tonight, let me give you some clear information about where we stand.

First, we have cons- — we have made considerable progress in battling COVID-19.  When I became President, about 2 million Americans were fully vaccinated.  Today, over 175 million Americans have that protection.

Before I took office, we hadn't ordered enough vaccine for every American.  Just weeks in office, we did.  The week before I took office, on January 20th of this year, over 25,000 Americans died that week from COVID-19.  Last week, that grim weekly toll was down 70 percent.

And in the three months before I took office, our economy was faltering, creating just 50,000 jobs a month.  We're now averaging 700,000 new jobs a month in the past three months.

This progress is real.  But while America is in much better shape than it was seven months ago when I took office, I need to tell you a second fact.

1/11/23, 5:42 PM
Remarks by President Biden on Fighting the COVID-19 Pandemic | The White House
Case 1:23-cv-05587-JRB-CCB   Document 1-2   Filed 12/06/23   Page 100 of 146

We're in a tough stretch, and it could last for a while.  The highly contagious Delta variant that I began to warn America about back in July spread in late summer like it did in other countries before us.

While the vaccines provide strong protections for the vaccinated, we read about, we hear about, and we see the stories of hospitalized people, people on their death beds, among the unvaccinated over these past few weeks.

This is a pandemic of the unvaccinated.  And it's caused by the fact that despite America having an unprecedented and successful vaccination program, despite the fact that for almost five months free vaccines have been available in 80,000 different locations, we still have nearly 80 million Americans
who have failed to get the shot.

And to make matters worse, there are elected officials actively working to undermine the fight against COVID-19.  Instead of encouraging people to get vaccinated and mask up, they're ordering mobile morgues for the unvaccinated dying from COVID in their communities.  This is totally unacceptable.

Third, if you wonder how all this adds up, here's the math:  The vast majority of Americans are doing the right thing.  Nearly three quarters of the eligible have gotten at least one shot, but one quarter has not gotten any.  That's nearly 80 million Americans not vaccinated.  And in a country as large as ours, that's 25 percent minority.  That 25 percent can cause a lot of damage — and they are.

The unvaccinated overcrowd our hospitals, are overrunning the emergency rooms and intensive care units, leaving no room for someone with a heart attack, or ~~pancreitis~~ [pancreatitis], or cancer.

And fourth, I want to emphasize that the vaccines provide very strong protection from severe illness from COVID-19.  I know there's a lot of confusion and misinformation.  But the world's leading scientists confirm that if you are fully vaccinated, your risk of severe illness from COVID-19 is very low.

In fact, based on available data from the summer, only one of out of every 160,000 fully vaccinated Americans was hospitalized for COVID per day.

These are the facts.

So here's where we stand: The path ahead, even with the Delta variant, is not nearly as bad as last winter.  But what makes it incredibly more frustrating is that we have the tools to combat COVID-19, and a distinct minority of Americans –supported by a distinct minority of elected officials — are

keeping us from turning the corner. These pandemic politics, as I refer to, are making people sick, causing unvaccinated people to die.

We cannot allow these actions to stand in the way of protecting the large majority of Americans who have done their part and want to get back to life as normal.

As your President, I'm announcing tonight a new plan to require more Americans to be vaccinated, to combat those blocking public health.

My plan also increases testing, protects our economy, and will make our kids safer in schools. It consists of six broad areas of action and many specific measures in each that — and each of those actions that you can read more about at WhiteHouse.gov. WhiteHouse.gov.

The measures — these are going to take time to have full impact. But if we implement them, I believe and the scientists indicate, that in the months ahead we can reduce the number of unvaccinated Americans, decrease hospitalizations and deaths, and allow our children to go to school safely and keep our economy strong by keeping businesses open.

First, we must increase vaccinations among the unvaccinated with new vaccination requirements. Of the nearly 80 million eligible Americans who have not gotten vaccinated, many said they were waiting for approval from the Food and Drug Administration — the FDA. Well, last month, the FDA granted that approval.

So, the time for waiting is over. This summer, we made progress through the combination of vaccine requirements and incentives, as well as the FDA approval. Four million more people got their first shot in August than they did in July.

But we need to do more. This is not about freedom or personal choice. It's about protecting yourself and those around you — the people you work with, the people you care about, the people you love.

My job as President is to protect all Americans.

So, tonight, I'm announcing that the Department of Labor is developing an emergency rule to require all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week.

Some of the biggest companies are already requiring this: United Airlines, Disney, Tysons Food, and even Fox News.

The bottom line: We're going to protect vaccinated workers from unvaccinated co-workers. We're going to reduce the spread of COVID-19 by

increasing the share of the workforce that is vaccinated in businesses all across America.

My plan will extend the vaccination requirements that I previously issued in the healthcare field.  Already, I've announced, we'll be requiring vaccinations that all nursing home workers who treat patients on Medicare and Medicaid, because I have that federal authority.

Tonight, I'm using that same authority to expand that to cover those who work in hospitals, home healthcare facilities, or other medical facilities –- a total of 17 million healthcare workers.

If you're seeking care at a health facility, you should be able to know that the people treating you are vaccinated.  Simple.  Straightforward.  Period.

Next, I will sign an executive order that will now require all executive branch federal employees to be vaccinated — all.  And I've signed another executive order that will require federal contractors to do the same.

If you want to work with the federal government and do business with us, get vaccinated.  If you want to do business with the federal government, vaccinate your workforce.

And tonight, I'm removing one of the last remaining obstacles that make it difficult for you to get vaccinated.

The Department of Labor will require employers with 100 or more workers to give those workers paid time off to get vaccinated.  No one should lose pay in order to get vaccinated or take a loved one to get vaccinated.

Today, in total, the vaccine requirements in my plan will affect about 100 million Americans –- two thirds of all workers.

And for other sectors, I issue this appeal: To those of you running large entertainment venues — from sports arenas to concert venues to movie theaters — please require folks to get vaccinated or show a negative test as a condition of entry.

And to the nation's family physicians, pediatricians, GPs — general practitioners –- you're the most trusted medical voice to your patients.  You may be the one person who can get someone to change their mind about being vaccinated.

Tonight, I'm asking each of you to reach out to your unvaccinated patients over the next two weeks and make a personal appeal to them to get the shot. America needs your personal involvement in this critical effort.

And my message to unvaccinated Americans is this: What more is there to

Case 1:23-cv-05587-JRB-CCB    Document 1-2    Filed 12/06/23    Page 103 of 146

wait for?  What more do you need to see?  We've made vaccinations free, safe, and convenient.

The vaccine has FDA approval.  Over 200 million Americans have gotten at least one shot.

We've been patient, but our patience is wearing thin.  And your refusal has cost all of us.  So, please, do the right thing.  But just don't take it from me; listen to the voices of unvaccinated Americans who are lying in hospital beds, taking their final breaths, saying, "If only I had gotten vaccinated."  "If only."

It's a tragedy.  Please don't let it become yours.

The second piece of my plan is continuing to protect the vaccinated.

For the vast majority of you who have gotten vaccinated, I understand your anger at those who haven't gotten vaccinated.  I understand the anxiety about getting a "breakthrough" case.

But as the science makes clear, if you're fully vaccinated, you're highly protected from severe illness, even if you get COVID-19.

In fact, recent data indicates there is only one confirmed positive case per 5,000 fully vaccinated Americans per day.

You're as safe as possible, and we're doing everything we can to keep it that way — keep it that way, keep you safe.

That's where boosters come in — the shots that give you even more protection than after your second shot.

Now, I know there's been some confusion about boosters.  So, let me be clear: Last month, our top government doctors announced an initial plan for booster shots for vaccinated Americans.  They believe that a booster is likely to provide the highest level of protection yet.

Of course, the decision of which booster shots to give, when to start them, and who will give them, will be left completely to the scientists at the FDA and the Centers for Disease Control.

But while we wait, we've done our part.  We've bought enough boosters — enough booster shots — and the distribution system is ready to administer them.

As soon as they are authorized, those eligible will be able to get a booster right away in tens of thousands of site across the — sites across the country for most Americans, at your nearby drug store, and for free.

1/11/23, 5:42 PM
Remarks by President Biden on Fighting the COVID-19 Pandemic | The White House
Case 1:23-cv-05587-JRB-CCB   Document 1-2   Filed 12/06/23   Page 104 of 146

The third piece of my plan is keeping — and maybe the most important — is keeping our children safe and our schools open.  For any parent, it doesn't matter how low the risk of any illness or accident is when it comes to your child or grandchild.  Trust me, I know.

So, let me speak to you directly.  Let me speak to you directly to help ease some of your worries.

It comes down to two separate categories: children ages 12 and older who are eligible for a vaccine now, and children ages 11 and under who are not are yet eligible.

The safest thing for your child 12 and older is to get them vaccinated.  They get vaccinated for a lot of things.  That's it.  Get them vaccinated.

As with adults, almost all the serious COVID-19 cases we're seeing among adolescents are in unvaccinated 12- to 17-year-olds — an age group that lags behind in vaccination rates.

So, parents, please get your teenager vaccinated.

What about children under the age of 12 who can't get vaccinated yet?  Well, the best way for a parent to protect their child under the age of 12 starts at home.  Every parent, every teen sibling, every caregiver around them should be vaccinated.

Children have four times higher chance of getting hospitalized if they live in a state with low vaccination rates rather than the states with high vaccination rates.

Now, if you're a parent of a young child, you're wondering when will it be — when will it be — the vaccine available for them.  I strongly support an independent scientific review for vaccine uses for children under 12.  We can't take shortcuts with that scientific work.

But I've made it clear I will do everything within my power to support the FDA with any resource it needs to continue to do this as safely and as quickly as possible, and our nation's top doctors are committed to keeping the public at large updated on the process so parents can plan.

Now to the schools.  We know that if schools follow the science and implement the safety measures — like testing, masking, adequate ventilation systems that we provided the money for, social distancing, and vaccinations — then children can be safe from COVID-19 in schools.

Today, about 90 percent of school staff and teachers are vaccinated.  We should get that to 100 percent.  My administration has already acquired teachers at the schools run by the Defense Department — because I have the

Case 1:23-cv-05587-JRB-CCB   Document 1-2   Filed 12/06/23   Page 105 of 146

authority as President in the federal system — the Defense Department and the Interior Department — to get vaccinated.  That's authority I possess.

Tonight, I'm announcing that we'll require all of nearly 300,000 educators in the federal paid program, Head Start program, must be vaccinated as well to protect your youngest — our youngest — most precious Americans and give parents the comfort.

And tonight, I'm calling on all governors to require vaccination for all teachers and staff.  Some already have done so, but we need more to step up.

Vaccination requirements in schools are nothing new.  They work.  They're overwhelmingly supported by educators and their unions.  And to all school officials trying to do the right thing by our children: I'll always be on your side.

Let me be blunt.  My plan also takes on elected officials and states that are undermining you and these lifesaving actions.  Right now, local school officials are trying to keep children safe in a pandemic while their governor picks a fight with them and even threatens their salaries or their jobs.  Talk about bullying in schools.  If they'll not help — if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way.

The Department of Education has already begun to take legal action against states undermining protection that local school officials have ordered.  Any teacher or school official whose pay is withheld for doing the right thing, we will have that pay restored by the federal government 100 percent.  I promise you I will have your back.

The fourth piece of my plan is increasing testing and masking.  From the start, America has failed to do enough COVID-19 testing.  In order to better detect and control the Delta variant, I'm taking steps tonight to make testing more available, more affordable, and more convenient.  I'll use the Defense Production Act to increase production of rapid tests, including those that you can use at home.

While that production is ramping up, my administration has worked with top retailers, like Walmart, Amazon, and Kroger's, and tonight we're announcing that, no later than next week, each of these outlets will start to sell at-home rapid test kits at cost for the next three months.  This is an immediate price reduction for at-home test kits for up to 35 percent reduction.

We'll also expand — expand free testing at 10,000 pharmacies around the country.  And we'll commit — we're committing $2 billion to purchase nearly 300 million rapid tests for distribution to community health centers, food banks, schools, so that every American, no matter their income, can access free and convenient tests.  This is important to everyone, particularly for a

parent or a child — with a child not old enough to be vaccinated.  You'll be able to test them at home and test those around them.

In addition to testing, we know masking helps stop the spread of COVID-19.  That's why when I came into office, I required masks for all federal buildings and on federal lands, on airlines, and other modes of transportation.

Today — tonight, I'm announcing that the Transportation Safety Administration — the TSA — will double the fines on travelers that refuse to mask.  If you break the rules, be prepared to pay.

And, by the way, show some respect.  The anger you see on television toward flight attendants and others doing their job is wrong; it's ugly.

The fifth piece of my plan is protecting our economic recovery.  Because of our vaccination program and the American Rescue Plan, which we passed early in my administration, we've had record job creation for a new administration, economic growth unmatched in 40 years.  We cannot let unvaccinated do this progress — undo it, turn it back.

So tonight, I'm announcing additional steps to strengthen our economic recovery.  We'll be expanding COVID-19 Economic Injury Disaster Loan programs.  That's a program that's going to allow small businesses to borrow up to $2 million from the current $500,000 to keep going if COVID-19 impacts on their sales.

These low-interest, long-term loans require no repayment for two years and be can used to hire and retain workers, purchase inventory, or even pay down higher cost debt racked up since the pandemic began.  I'll also be taking additional steps to help small businesses stay afloat during the pandemic.

Sixth, we're going to continue to improve the care of those who do get COVID-19.  In early July, I announced the deployment of surge response teams.  These are teams comprised of experts from the Department of Health and Human Services, the CDC, the Defense Department, and the Federal Emergency Management Agency — FEMA — to areas in the country that need help to stem the spread of COVID-19.

Since then, the federal government has deployed nearly 1,000 staff, including doctors, nurses, paramedics, into 18 states.  Today, I'm announcing that the Defense Department will double the number of military health teams that they'll deploy to help their fellow Americans in hospitals around the country.

Additionally, we're increasing the availability of new medicines recommended by real doctors, not conspir- — conspiracy theorists.  The monoclonal antibody treatments have been shown to reduce the risk of hospitalization by up to 70 percent for unvaccinated people at risk of

developing sefe- — severe disease.

We've already distributed 1.4 million courses of these treatments to save lives and reduce the strain on hospitals.  Tonight, I'm announcing we will increase the average pace of shipment across the country of free monoclonal antibody treatments by another 50 percent.

Before I close, let me say this: Communities of color are disproportionately impacted by this virus.  And as we continue to battle COVID-19, we will ensure that equity continues to be at the center of our response.  We'll ensure that everyone is reached.  My first responsibility as President is to protect the American people and make sure we have enough vaccine for every American, including enough boosters for every American who's approved to get one.

We also know this virus transcends borders.  That's why, even as we execute this plan at home, we need to continue fighting the virus overseas, continue to be the arsenal of vaccines.

We're proud to have donated nearly 140 million vaccines over 90 countries, more than all other countries combined, including Europe, China, and Russia combined.  That's American leadership on a global stage, and that's just the beginning.

We've also now started to ship another 500 million COVID vaccines — Pfizer vaccines — purchased to donate to 100 lower-income countries in need of vaccines.  And I'll be announcing additional steps to help the rest of the world later this month.

As I recently released the key parts of my pandemic preparedness plan so that America isn't caught flat-footed when a new pandemic comes again — as it will — next month, I'm also going to release the plan in greater detail.

So let me close with this: We have so- — we've made so much progress during the past seven months of this pandemic.  The recent increases in vaccinations in August already are having an impact in some states where case counts are dropping in recent days.  Even so, we remain at a critical moment, a critical time.  We have the tools.  Now we just have to finish the job with truth, with science, with confidence, and together as one nation.

Look, we're the United States of America.  There's nothing — not a single thing — we're unable to do if we do it together.  So let's stay together.

God bless you all and all those who continue to serve on the frontlines of this pandemic.  And may God protect our troops.

Get vaccinated.

5:28 P.M. EDT

Case 1:23-cv-05587-JRB-CCB    Document 1-2    Filed 12/06/23    Page 108 of 146

 **Gmail**

**Scottee LP <scotteelp@gmail.com>**

## Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

4 messages

**Richards, Scott** <scott.richards@warnermedia.com>                    Sat, Aug 7, 2021 at 4:21 PM
To: "Calderon, Daphne" <daphne.calderon@warnermedia.com>

Hi Daphne,

Can you help me?

I'm attempting to better educate myself with regards to the latest COVID19 vaccination mandate the company has announced.

To my knowledge, I haven't received the exact vaccine mandate policy provided by HR, can you provide or point me to this policy?

Can you provide me where I can locate the company's health and religious exemption information with respect to this vaccine mandate?

Are there any company resources explaining what accommodations are provided with regards to the health and religious exemptions the company is honoring?

I haven't been provided an exact date of when this mandate will be explicitly enforced. Can you clarify?

Is there an HR policy that addresses the potential safety concerns if an employee were to spread misinformation amongst other employees in the workplace regarding vaccine status?

I've requested this information from management, but I was told to request this information from You/HR.

I look forward to working with you on this.

Thanks in advance!

-S-

Scott Richards

Sports Central Engineering

---

**Richards, Scott** <scott.richards@warnermedia.com>                                    Wed, Aug 11, 2021 at 3:27 PM
To: "shellster2273@gmail.com" <shellster2273@gmail.com>, Scottee LP <scotteelp@gmail.com>

-S-

---

**From:** Calderon, Daphne <daphne.calderon@warnermedia.com>
**Sent:** Wednesday, August 11, 2021 10:05:34 AM
**To:** Richards, Scott <scott.richards@warnermedia.com>
**Cc:** Manuel, Kayla <kayla.manuel@warnermedia.com>
**Subject:** RE: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

Hi Scott,

Hope you're well and thanks for reaching out! Current guidance for WMTO employees who work on-site in a CNN Facility or who work closely with CNN employees is that they must be fully vaccinated. As you may understand, as the Covid-19 virus evolves and we learn more about it, we have been continuously reviewing our safety protocols and guidance with the objective of keeping our employees safe. You can find our current vaccination policy & resources here: COVID-19 Vaccination & Reporting | WarnerMedia One.

If you are seeking an exemption to the Company's vaccine requirements because you need an accommodation related to your own medical circumstances or religious beliefs, you can submit a request via our Xempt system.

If you have concerns regarding employees spreading misinformation regarding vaccine status, please let us know.

We hope this answers your questions and provides a little more clarity. As we continue to receive additional info and updates, we will continue to share with the leadership team and broader organization.

Let us know if you have any questions.

Best,

**Daphne Calderon | People Partner Lead | WMTO HR**

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Saturday, August 7, 2021 4:22 PM
**To:** Calderon, Daphne <daphne.calderon@warnermedia.com>
**Subject:** Scott Richards - Request for COVID19 Vaccine Mandate Policy Info
**Importance:** High

Hi Daphne,

Can you help me?

I'm attempting to better educate myself with regards to the latest COVID19 vaccination mandate the company has announced.

To my knowledge, I haven't received the exact vaccine mandate policy provided by HR, can you provide or point me to this policy?

Can you provide me where I can locate the company's health and religious exemption information with respect to this vaccine mandate?

Are there any company resources explaining what accommodations are provided with regards to the health and religious exemptions the company is honoring?

I haven't been provided an exact date of when this mandate will be explicitly enforced. Can you clarify?

Is there an HR policy that addresses the potential safety concerns if an employee were to spread misinformation amongst other employees in the workplace regarding vaccine status?

I've requested this information from management, but I was told to request this information from You/HR.

I look forward to working with you on this.

Thanks in advance!

-S-

Scott Richards

Sports Central Engineering

---

**Richards, Scott** <scott.richards@warnermedia.com>                                    Wed, Aug 11, 2021 at 4:10 PM
To: "shellster2273@gmail.com" <shellster2273@gmail.com>, Scottee LP <scotteelp@gmail.com>

**From:** "Richards, Scott" <scott.richards@warnermedia.com>
**Date:** Wednesday, August 11, 2021 at 4:09 PM
**To:** "Calderon, Daphne" <daphne.calderon@warnermedia.com>
**Cc:** "Manuel, Kayla" <kayla.manuel@warnermedia.com>
**Subject:** Re: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

This information is very much appreciated – thank you!

Has there been any explanation as to why this information I just received today wasn't sent out on July 15 2021 when the initial mandate notification was received in my co-workers and my inbox?

I do have personal experience with employee's asking others about their vaccine status, assuming status if not shared, and then verbally broadcasting those assumptions amongst my peers in the workplace. This has unfortunately created very uncomfortable reactions amongst my peers and seems to have affected the overall morale in my work area. This concerns me greatly, as the safety and security of all employees is one of the company's highest priorities from what I'm reading today with the information provided.

BR,

-S-

---

**From:** "Calderon, Daphne" <daphne.calderon@warnermedia.com>
**Date:** Wednesday, August 11, 2021 at 10:05 AM
**To:** "Richards, Scott" <scott.richards@warnermedia.com>
**Cc:** "Manuel, Kayla" <kayla.manuel@warnermedia.com>
**Subject:** RE: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

Hi Scott,

Hope you're well and thanks for reaching out! Current guidance for WMTO employees who work on-site in a CNN Facility or who work closely with CNN employees is that they must be fully vaccinated. As you may understand, as the Covid-19 virus evolves and we learn more about it, we have been continuously reviewing our safety protocols and guidance with the objective of keeping our employees safe. You can find our current vaccination policy & resources here: COVID-19 Vaccination & Reporting | WarnerMedia One.

If you are seeking an exemption to the Company's vaccine requirements because you need an accommodation related to your own medical circumstances or religious beliefs, you can submit a request via our Xempt system.

If you have concerns regarding employees spreading misinformation regarding vaccine status, please let us know.

We hope this answers your questions and provides a little more clarity. As we continue to receive additional info and updates, we will continue to share with the leadership team and broader organization.

Let us know if you have any questions.

Best,

**Daphne Calderon | People Partner Lead | WMTO HR**

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Saturday, August 7, 2021 4:22 PM
**To:** Calderon, Daphne <daphne.calderon@warnermedia.com>
**Subject:** Scott Richards - Request for COVID19 Vaccine Mandate Policy Info
**Importance:** High

Hi Daphne,

Can you help me?

I'm attempting to better educate myself with regards to the latest COVID19 vaccination mandate the company has announced.

To my knowledge, I haven't received the exact vaccine mandate policy provided by HR, can you provide or point me to this policy?

Can you provide me where I can locate the company's health and religious exemption information with respect to this vaccine mandate?

Are there any company resources explaining what accommodations are provided with regards to the health and religious exemptions the company is honoring?

I haven't been provided an exact date of when this mandate will be explicitly enforced. Can you clarify?

Is there an HR policy that addresses the potential safety concerns if an employee were to spread misinformation amongst other employees in the workplace regarding vaccine status?

I've requested this information from management, but I was told to request this information from You/HR.

I look forward to working with you on this.


Thanks in advance!


-S-


Scott Richards

Sports Central Engineering

---

**Richards, Scott** <scott.richards@warnermedia.com>                    Thu, Aug 19, 2021 at 3:20 PM
To: "shellster2273@gmail.com" <shellster2273@gmail.com>, Scottee LP <scotteelp@gmail.com>

---

**From:** "Richards, Scott" <scott.richards@warnermedia.com>
**Date:** Thursday, August 19, 2021 at 3:19 PM
**To:** "Calderon, Daphne" <daphne.calderon@warnermedia.com>
**Cc:** "Manuel, Kayla" <kayla.manuel@warnermedia.com>
**Subject:** Re: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info


Daphne,


Thank you so much for responding!


I have spoken to my manager about these concerns, and I have been advised to follow up HR regarding them.


Also, I've submitted an exemption, when should I expect a response to my submission?


Thank again!!


BR,


-S-

**From:** "Calderon, Daphne" <daphne.calderon@warnermedia.com>
**Date:** Thursday, August 19, 2021 at 1:24 PM
**To:** "Richards, Scott" <scott.richards@warnermedia.com>
**Cc:** "Manuel, Kayla" <kayla.manuel@warnermedia.com>
**Subject:** RE: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

Hi Scott,

As you may understand, our guidance and policies have been evolving and have been doing our best in sharing latest guidance and information. You can find latest guidance in this link

COVID-19 Vaccination & Reporting | WarnerMedia One

Thank you for raising your concerns regarding others sharing vaccination status.

Have you spoken to your managers about this? If you are comfortable, I would encourage you to have a conversation with them to share more specifics so they can potentially address more broadly in a team meeting/communication if they see fit.

Please don't hesitate to reach out with any other questions. Thanks!

Daphne

**Daphne Calderon | People Partner Lead | WMTO HR**

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Wednesday, August 11, 2021 4:10 PM
**To:** Calderon, Daphne <daphne.calderon@warnermedia.com>
**Cc:** Manuel, Kayla <kayla.manuel@warnermedia.com>
**Subject:** Re: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

This information is very much appreciated – thank you!

Has there been any explanation as to why this information I just received today wasn't sent out on July 15 2021 when the initial mandate notification was received in my co-workers and my inbox?

I do have personal experience with employee's asking others about their vaccine status, assuming status if not shared, and then verbally broadcasting those assumptions amongst my peers in the workplace. This has unfortunately created very uncomfortable reactions amongst my peers and seems to have affected the overall morale in my work area. This concerns me greatly, as the safety and security of all employees is one of the company's highest priorities from what I'm reading today with the information provided.

BR,

---

**From:** "Calderon, Daphne" <daphne.calderon@warnermedia.com>
**Date:** Wednesday, August 11, 2021 at 10:05 AM
**To:** "Richards, Scott" <scott.richards@warnermedia.com>
**Cc:** "Manuel, Kayla" <kayla.manuel@warnermedia.com>
**Subject:** RE: Scott Richards - Request for COVID19 Vaccine Mandate Policy Info

Hi Scott,

Hope you're well and thanks for reaching out! Current guidance for WMTO employees who work on-site in a CNN Facility or who work closely with CNN employees is that they must be fully vaccinated. As you may understand, as the Covid-19 virus evolves and we learn more about it, we have been continuously reviewing our safety protocols and guidance with the objective of keeping our employees safe. You can find our current vaccination policy & resources here: COVID-19 Vaccination & Reporting | WarnerMedia One.

If you are seeking an exemption to the Company's vaccine requirements because you need an accommodation related to your own medical circumstances or religious beliefs, you can submit a request via our Xempt system.

If you have concerns regarding employees spreading misinformation regarding vaccine status, please let us know.

We hope this answers your questions and provides a little more clarity. As we continue to receive additional info and updates, we will continue to share with the leadership team and broader organization.

Let us know if you have any questions.

Best,

**Daphne Calderon | People Partner Lead | WMTO HR**

---

**From:** Richards, Scott <scott.richards@warnermedia.com>
**Sent:** Saturday, August 7, 2021 4:22 PM
**To:** Calderon, Daphne <daphne.calderon@warnermedia.com>
**Subject:** Scott Richards - Request for COVID19 Vaccine Mandate Policy Info
**Importance:** High

Hi Daphne,

Can you help me?

I'm attempting to better educate myself with regards to the latest COVID19 vaccination mandate the company has announced.

To my knowledge, I haven't received the exact vaccine mandate policy provided by HR, can you provide or point me to this policy?

Can you provide me where I can locate the company's health and religious exemption information with respect to this vaccine mandate?

Are there any company resources explaining what accommodations are provided with regards to the health and religious exemptions the company is honoring?

I haven't been provided an exact date of when this mandate will be explicitly enforced. Can you clarify?

Is there an HR policy that addresses the potential safety concerns if an employee were to spread misinformation amongst other employees in the workplace regarding vaccine status?

I've requested this information from management, but I was told to request this information from You/HR.

I look forward to working with you on this.

Thanks in advance!

-S-

Scott Richards

Sports Central Engineering

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GROFF *v.* DEJOY, POSTMASTER GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22–174.   Argued April 18, 2023—Decided June 29, 2023

Petitioner Gerald Groff is an Evangelical Christian who believes for religious reasons that Sunday should be devoted to worship and rest. In 2012, Groff took a mail delivery job with the United States Postal Service. Groff's position generally did not involve Sunday work, but that changed after USPS agreed to begin facilitating Sunday deliveries for Amazon. To avoid the requirement to work Sundays on a rotating basis, Groff transferred to a rural USPS station that did not make Sunday deliveries. After Amazon deliveries began at that station as well, Groff remained unwilling to work Sundays, and USPS redistributed Groff's Sunday deliveries to other USPS staff. Groff received "progressive discipline" for failing to work on Sundays, and he eventually resigned.

Groff sued under Title VII of the Civil Rights Act of 1964, asserting that USPS could have accommodated his Sunday Sabbath practice "without undue hardship on the conduct of [USPS's] business." 42 U. S. C. §2000e(j). The District Court granted summary judgment to USPS. The Third Circuit affirmed based on this Court's decision in *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, which it construed to mean "that requiring an employer 'to bear more than a de minimis cost' to provide a religious accommodation is an undue hardship." 35 F. 4th 162, 174, n. 18 (quoting 432 U. S., at 84). The Third Circuit found the *de minimis* cost standard met here, concluding that exempting Groff from Sunday work had "imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale." 35 F. 4th, at 175.

*Held*: Title VII requires an employer that denies a religious accommodation to show that the burden of granting an accommodation would re-

2                             GROFF *v.* DEJOY

sult in substantial increased costs in relation to the conduct of its particular business. Pp. 4–21.

(a) This case presents the Court's first opportunity in nearly 50 years to explain the contours of *Hardison.* The background of that decision helps to explain the Court's disposition of this case. Pp. 4–15.

(1) Title VII of the Civil Rights Act of 1964 made it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges [of] employment, because of such individual's . . . religion." §2000e–2(a)(1). As originally enacted, Title VII did not spell out what it meant by discrimination "because of . . . religion." Subsequent regulations issued by the EEOC obligated employers "to make reasonable accommodations to the religious needs of employees" whenever doing so would not create "undue hardship on the conduct of the employer's business." 29 CFR §1605.1 (1968). In 1970, however, the Sixth Circuit held that Title VII did not require an employer "to accede to or accommodate" a Sabbath religious practice because to do so "would raise grave" Establishment Clause questions. *Dewey* v. *Reynolds Metals Co.*, 429 F. 2d 324, 334. This Court affirmed *Dewey* by an evenly divided vote. See 402 U. S. 689. Congress responded by amending Title VII in 1972 to track the EEOC's regulatory language and to clarify that employers must "reasonably accommodate. . . an employee's or prospective employee's religious observance or practice" unless the employer is "unable" to do so "without undue hardship on the conduct of the employer's business." §2000e(j). Pp. 4–6.

(2) *Hardison* concerned an employment dispute that arose prior to the 1972 amendments to Title VII. In 1967, Trans World Airlines hired Larry Hardison to work in a department that operated "24 hours per day, 365 days per year" and played an "essential role" for TWA by providing parts needed to repair and maintain aircraft. *Hardison*, 432 U. S., at 66. Hardison later underwent a religious conversion and began missing work to observe the Sabbath. Initial conflicts with Hardison's work schedule were resolved, but conflicts resurfaced when he transferred to another position in which he lacked the seniority to avoid work during his Sabbath. Attempts at accommodation failed, and TWA discharged Hardison for insubordination.

Hardison sued TWA and his union, and the Eighth Circuit sided with Hardison. The Eighth Circuit found that reasonable accommodations were available to TWA, and rejected the defendants' Establishment Clause arguments. *Hardison* v. *Trans World Airlines, Inc.*, 527 F. 2d 33, 42–44. This Court granted certiorari. TWA's petition for certiorari asked this Court to decide whether the 1972 amendment of Title VII violated the Establishment Clause as applied by the Eighth

Syllabus

Circuit, particularly insofar as that decision had approved an accommodation that allegedly overrode seniority rights granted by the relevant collective bargaining agreement. At the time, some thought that the Court's now-abrogated decision in *Lemon* v. *Kurtzman*, 403 U. S. 602—which adopted a test under which any law whose "principal or primary effect" "was to advance religion" was unconstitutional, *id.*, at 612–613—posed a serious problem for the 1972 amendment of Title VII. Ultimately, however, constitutional concerns played no on-stage role in the Court's decision in *Hardison*. Instead, the Court's opinion stated that "the principal issue on which TWA and the union came to this Court" was whether Title VII "require[s] an employer and a union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices." *Hardison*, 432 U. S., at 83, and n. 14. The Court held that Title VII imposed no such requirement. *Id.*, at 83, and n. 14. This conclusion, the Court found, was "supported by the fact that seniority systems are afforded special treatment under Title VII itself." *Id.*, at 81. Applying this interpretation of Title VII and disagreeing with the Eighth Circuit's evaluation of the factual record, the Court identified no way in which TWA, without violating seniority rights, could have feasibly accommodated Hardison's request for an exemption from work on his Sabbath.

The parties had not focused on determining when increased costs amount to "undue hardship" under Title VII separately from the seniority issue. But the Court's opinion in *Hardison* contained this oft-quoted sentence: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." Although many lower courts later viewed this line as the authoritative interpretation of the statutory term "undue hardship," the context renders that reading doubtful. In responding to Justice Marshall's dissent, the Court described the governing standard quite differently, stating three times that an accommodation is not required when it entails "substantial" "costs" or "expenditures." *Id.*, at 83, n. 14. Pp. 6–12.

(3) Even though *Hardison*'s reference to "*de minimis*" was undercut by conflicting language and was fleeting in comparison to its discussion of the "principal issue" of seniority rights, lower courts have latched on to "*de minimis*" as the governing standard. To be sure, many courts have understood that the protection for religious adherents is greater than "more than . . . *de minimis*" might suggest when read in isolation. But diverse religious groups tell the Court that the "*de minimis*" standard has been used to deny even minor accommodations. The EEOC has also accepted *Hardison* as prescribing a "more than a *de minimis* cost" test, 29 CFR §1605.2(e)(1), though it has tried

4                          GROFF *v.* DEJOY

                               Syllabus

to soften its impact, cautioning against extending the phrase to cover
such things as the "administrative costs" involved in reworking sched-
ules, the "infrequent" or temporary "payment of premium wages for a
substitute," and "voluntary substitutes and swaps" when they are not
contrary to a "bona fide seniority system." §§1605.2(e)(1), (2). Yet
some courts have rejected even the EEOC's gloss on "*de minimis*," re-
jecting accommodations the EEOC's guidelines consider to be ordinar-
ily required. The Court agrees with the Solicitor General that *Hardi-
son* does not compel courts to read the "more than *de minimis*"
standard "literally" or in a manner that undermines *Hardison*'s refer-
ences to "substantial" cost. Tr. of Oral Arg. 107. Pp. 12–15.

   (b) The Court holds that showing "more than a *de minimis* cost," as
that phrase is used in common parlance, does not suffice to establish
"undue hardship" under Title VII. *Hardison* cannot be reduced to that
one phrase. In describing an employer's "undue hardship" defense,
*Hardison* referred repeatedly to "substantial" burdens, and that for-
mulation better explains the decision. The Court understands *Hardi-
son* to mean that "undue hardship" is shown when a burden is sub-
stantial in the overall context of an employer's business. This fact-
specific inquiry comports with both *Hardison* and the meaning of "un-
due hardship" in ordinary speech. Pp. 15–21.

      (1) To determine what an employer must prove to defend a denial
of a religious accommodation under Title VII, the Court begins with
Title VII's text. The statutory term, "hardship," refers to, at a mini-
mum, "something hard to bear" and suggests something more severe
than a mere burden. If Title VII said only that an employer need not
be made to suffer a "hardship," an employer could not escape liability
simply by showing that an accommodation would impose some sort of
additional costs. Adding the modifier "undue" means that the requi-
site burden or adversity must rise to an "excessive" or "unjustifiable"
level. Understood in this way, "undue hardship" means something
very different from a burden that is merely more than *de minimis*, *i.e.,*
"very small or trifling." The ordinary meaning of "undue hardship"
thus points toward a standard closer to *Hardison*'s references to "sub-
stantial additional costs" or "substantial expenditures." 432 U. S., at
83, n. 14. Further, the Court's reading of the statutory term comports
with pre-1972 EEOC decisions, so nothing in that history plausibly
suggests that "undue hardship" in Title VII should be read to mean
anything less than its meaning in ordinary use. Cf. *George* v.
*McDonough*, 596 U. S. ___, ___. And no support exists in other factors
discussed by the parties for reducing *Hardison* to its "more than a *de
minimis* cost" line. Pp. 16–18.

      (2) The parties agree that the "*de minimis*" test is not right, but
they differ in the alternative language they propose. The Court thinks

Syllabus

it is enough to say that what an employer must show is that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business.  *Hardison*, 432 U. S. at 83, n. 14.  Courts must apply the test to take into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer.  Pp. 18.

(3) The Court declines to adopt the elaborations of the applicable standard that the parties suggest, either to incorporate Americans with Disabilities Act case law or opine that the EEOC's construction of *Hardison* has been basically correct.  A good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by the Court's clarifying decision.  But it would not be prudent to ratify *in toto* a body of EEOC interpretation that has not had the benefit of the clarification the Court adopts today.  What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test.  Pp. 18–19.

(4) The Court also clarifies several recurring issues.  First, as the parties agree, Title VII requires an assessment of a possible accommodation's effect on "the conduct of the employer's business."  §2000e(j).  Impacts on coworkers are relevant only to the extent those impacts go on to affect the conduct of the business.  A court must analyze whether that further logical step is shown.  Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue."  Bias or hostility to a religious practice or accommodation cannot supply a defense.

Second, Title VII requires that an employer "reasonably accommodate" an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations.  Faced with an accommodation request like Groff's, an employer must do more that conclude that forcing other employees to work overtime would constitute an undue hardship.  Consideration of other options would also be necessary.  Pp. 19–20.

(c) Having clarified the Title VII undue-hardship standard, the Court leaves the context-specific application of that clarified standard in this case to the lower courts in the first instance.  Pp. 21.

35 F. 4th 162, vacated and remanded.

ALITO, J., delivered the opinion for a unanimous Court.  SOTOMAYOR, J., filed a concurring opinion, in which JACKSON, J., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 22–174

———

## GERALD E. GROFF, PETITIONER *v.* LOUIS DeJOY, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 29, 2023]

JUSTICE ALITO delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964 requires employers to accommodate the religious practice of their employees unless doing so would impose an "undue hardship on the conduct of the employer's business."  78 Stat. 253, as amended, 42 U. S. C. §2000e(j).  Based on a line in this Court's decision in *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 84 (1977), many lower courts, including the Third Circuit below, have interpreted "undue hardship" to mean any effort or cost that is "more than . . . *de minimis*." In this case, however, both parties—the plaintiff-petitioner, Gerald Groff, and the defendant-respondent, the Postmaster General, represented by the Solicitor General—agree that the *de minimis* reading of *Hardison* is a mistake.  With the benefit of thorough briefing and oral argument, we today clarify what Title VII requires.

I

Gerald Groff is an Evangelical Christian who believes for religious reasons that Sunday should be devoted to worship and rest, not "secular labor" and the "transport[ation]" of

Opinion of the Court

worldly "goods." App. 294. In 2012, Groff began his employment with the United States Postal Service (USPS), which has more than 600,000 employees. He became a Rural Carrier Associate, a job that required him to assist regular carriers in the delivery of mail. When he took the position, it generally did not involve Sunday work. But within a few years, that changed. In 2013, USPS entered into an agreement with Amazon to begin facilitating Sunday deliveries, and in 2016, USPS signed a memorandum of understanding with the relevant union (the National Rural Letter Carriers' Association) that set out how Sunday and holiday parcel delivery would be handled. During a 2-month peak season, each post office would use its own staff to deliver packages. At all other times, Sunday and holiday deliveries would be carried out by employees (including Rural Carrier Associates like Groff) working from a "regional hub." For Quarryville, Pennsylvania, where Groff was originally stationed, the regional hub was the Lancaster Annex.

The memorandum specifies the order in which USPS employees are to be called on for Sunday work outside the peak season. First in line are each hub's "Assistant Rural Carriers"— part-time employees who are assigned to the hub and cover only Sundays and holidays. Second are any volunteers from the geographic area, who are assigned on a rotating basis. And third are all other carriers, who are compelled to do the work on a rotating basis. Groff fell into this third category, and after the memorandum of understanding was adopted, he was told that he would be required to work on Sunday. He then sought and received a transfer to Holtwood, a small rural USPS station that had only seven employees and that, at the time, did not make Sunday deliveries. But in March 2017, Amazon deliveries began there as well.

With Groff unwilling to work on Sundays, USPS made other arrangements. During the peak season, Sunday deliveries that would have otherwise been performed by Groff

Opinion of the Court

were carried out by the rest of the Holtwood staff, including the postmaster, whose job ordinarily does not involve delivering mail. During other months, Groff's Sunday assignments were redistributed to other carriers assigned to the regional hub.[1] Throughout this time, Groff continued to receive "progressive discipline" for failing to work on Sundays. 35 F. 4th 162, 166 (CA3 2022). Finally, in January 2019, he resigned.[2]

A few months later, Groff sued under Title VII, asserting that USPS could have accommodated his Sunday Sabbath practice "without undue hardship on the conduct of [USPS's] business." 42 U. S. C. §2000e(j). The District Court granted summary judgment to USPS, 2021 WL 1264030 (ED Pa., Apr. 6, 2021), and the Third Circuit affirmed. The panel majority felt that it was "bound by [the] ruling" in *Hardison*, which it construed to mean "that requiring an employer 'to bear more than a de minimis cost' to provide a religious accommodation is an undue hardship." 35 F. 4th, at 174, n. 18 (quoting 432 U. S., at 84). Under Circuit precedent, the panel observed, this was "not a difficult threshold to pass," 35 F. 4th, at 174 (internal quotation marks omitted), and it held that this low standard was met in this case. Exempting Groff from Sunday work, the panel found, had "imposed on his coworkers, disrupted

——————

[1] Other employees complained about the consequences of Groff's absences. While the parties dispute some of the details, it appears uncontested that at least one employee filed a grievance asserting a conflict with his contractual rights. After disputing any conflict with contract rights, USPS eventually settled that claim, with the settlement reaffirming USPS's commitment to the Memorandum of Understanding. App. 118, 125–126.

[2] Groff represents that his resignation was in light of expected termination, and the District Court found "a genuine issue of material fact" foreclosed summary judgment as to whether Groff suffered an adverse employment action. 2021 WL 1264030,*8 (ED Pa., Apr. 6, 2021). The Government does not dispute the point in this Court.

the workplace and workflow, and diminished employee mo-
rale." *Id.*, at 175.  Judge Hardiman dissented, concluding
that adverse "effects on USPS employees in Lancaster or
Holtwood" did not alone suffice to show the needed hard-
ship "on the employer's *business*." *Id.*, at 177 (emphasis in
original).

We granted Groff's ensuing petition for a writ of certio-
rari.  598 U. S. ___ (2023).

## II

Because this case presents our first opportunity in nearly
50 years to explain the contours of *Hardison*, we begin by
recounting the legal backdrop to that case, including the de-
velopment of the Title VII provision barring religious dis-
crimination and the Equal Employment Opportunity Com-
mission's (EEOC's) regulations and guidance regarding
that prohibition.  We then summarize how the *Hardison*
case progressed to final decision, and finally, we discuss
how courts and the EEOC have understood its significance.
This background helps to explain the clarifications we offer
today.

## A

Since its passage, Title VII of the Civil Rights Act of 1964
has made it unlawful for covered employers "to fail or refuse
to hire or to discharge any individual, or otherwise to dis-
criminate against any individual with respect to his com-
pensation, terms, conditions, or privileges [of] employment,
because of such individual's . . . religion."  42 U. S. C.
§2000e–2(a)(1) (1964 ed.).  As originally enacted, Title VII
did not spell out what it meant by discrimination "because
of . . . religion," but shortly after the statute's passage, the
EEOC interpreted that provision to mean that employers
were sometimes required to "accommodate" the "reasonable
religious needs of employees."  29 CFR § 1605.1(a)(2) (1967).
After some tinkering, the EEOC settled on a formulation

Cite as:  600 U. S. \_\_\_\_ (2023)                    5

Opinion of the Court

that obligated employers "to make reasonable accommoda-
tions to the religious needs of employees" whenever that
would not work an "undue hardship on the conduct of the
employer's business."  29 CFR § 1605.1 (1968).

Between 1968 and 1972, the EEOC elaborated on its un-
derstanding of "undue hardship" in a "long line of decisions"
addressing a variety of policies.  *Hardison*, 432 U. S., at 85
(Marshall, J., dissenting); see Brief for General Conference
of Seventh-day Adventists as *Amicus Curiae* 10–22 (collect-
ing decisions).  Those decisions addressed many accommo-
dation issues that still arise frequently today, including the
wearing of religious garb[3] and time off from work to attend
to religious obligations.[4]

EEOC decisions did not settle the question of undue hard-
ship.  In 1970, the Sixth Circuit held (in a Sabbath case)
that Title VII as then written did not require an employer

_____

[3] See, *e.g.*, EEOC Dec. No. 71–779, 1970 WL 3550, *2 (Dec. 21, 1970)
(no undue hardship in permitting nurse to wear religious headscarf).

[4] See EEOC Dec. No. 71–463, 1970 WL 3544, *1–*2 (Nov. 13, 1970) (no
"undue hardship" or "unreasonable burde[n]" for employer to train co-
worker to cover two-week religious absence); EEOC Dec. No. 70–580,
1970 WL 3513, *1–*2 (Mar. 2, 1970) (manufacturing employer asked to
accommodate sundown-to-sundown Sabbath observance did not carry
"burden . . . to demonstrate undue hardship" where it did not address
"whether another employee could be trained to substitute for the Charg-
ing Party during Sabbath days, or whether already qualified personnel
ha[d] been invited to work a double shift"); EEOC Dec. No. 70–670, 1970
WL 3518, *2 (Mar. 30, 1970) (no "undue 'hardship'" in having other em-
ployees take on a few more on-call Saturdays per year); see also EEOC
Dec. No. 70–110, 1969 WL 2908, *1–*2 (Aug. 27, 1969) (employer could
not deny employee all Sunday "overtime opportunities" on basis of em-
ployee's religious inability to work Saturday, where others not working
the full weekend had been accommodated, notwithstanding employer's
claim of "considerable expense"); EEOC Dec. No. 70–99, 1969 WL 2905,
*1 (Aug. 27, 1969) (no obligation to accommodate seasonal employee un-
available for Saturday work, where employer showed both "no available
pool of qualified employees" to substitute and a "practical impossibility
of obtaining and training an employee" to cover one day a week for six
weeks).

6                          GROFF *v.* DEJOY

"to accede to or accommodate" religious practice because
that "would raise grave" Establishment Clause questions.
*Dewey* v. *Reynolds Metals Co.*, 429 F. 2d 324, 334. This
Court granted certiorari, 400 U. S. 1008, but then affirmed
by an evenly divided vote, 402 U. S. 689 (1971).

Responding to *Dewey* and another decision rejecting any
duty to accommodate an employee's observance of the Sab-
bath, Congress amended Title VII in 1972. *Hardison*, 432
U. S., at 73–74; *id.*, at 88–89 (Marshall, J., dissenting).
Tracking the EEOC's regulatory language, Congress pro-
vided that "[t]he term 'religion' includes all aspects of reli-
gious observance and practice, as well as belief, unless an
employer demonstrates that he is unable to reasonably ac-
commodate to an employee's or prospective employee's reli-
gious observance or practice without undue hardship on the
conduct of the employer's business." 42 U. S. C. §2000e(j)
(1970 ed., Supp. II).

B

The *Hardison* case concerned a dispute that arose during
the interval between the issuance of the EEOC's "undue
hardship" regulation and the 1972 amendment to Title VII.
In 1967, Larry Hardison was hired as a clerk at the Stores
Department in the Kansas City base of Trans World Air-
lines (TWA). The Stores Department was responsible for
providing parts needed to repair and maintain aircraft.
*Hardison* v. *Trans World Airlines*, 375 F. Supp. 877, 889
(WD Mo. 1974). It played an "essential role" and operated
"24 hours per day, 365 days per year." *Hardison*, 432 U. S.,
at 66. After taking this job, Hardison underwent a religious
conversion. He began to observe the Sabbath by absenting
himself from work from sunset on Friday to sunset on Sat-
urday, and this conflicted with his work schedule. The
problem was solved for a time when Hardison, who worked
in Building 1, switched to the night shift, but it resurfaced
when he sought and obtained a transfer to the day shift in

Opinion of the Court

Building 2 so that he could spend evenings with his wife. 375 F. Supp., at 889.  In that new building, he did not have enough seniority to avoid work during his Sabbath.  Attempts at accommodation failed, and he was eventually "discharged on grounds of insubordination."  432 U. S., at 69.

Hardison sued TWA and his union, the International Association of Machinists and Aerospace Workers (IAM).[5]  The Eighth Circuit found that reasonable accommodations were available, and it rejected the defendants' Establishment Clause arguments.  *Hardison* v. *Trans World Airlines, Inc.*, 527 F. 2d 33, 42–44 (1975).

Both TWA and IAM then filed petitions for certiorari, with TWA's lead petition asking this Court to decide whether the 1972 amendment of Title VII violated the Establishment Clause as applied in the decision below, particularly insofar as that decision had approved an accommodation that allegedly overrode seniority rights granted by the relevant collective bargaining agreement.[6]  The Court granted both petitions.  429 U. S. 958 (1976).

When the Court took that action, all counsel had good reason to expect that the Establishment Clause would figure prominently in the Court's analysis.  As noted above, in June 1971, the Court, by an equally divided vote, had affirmed the Sixth Circuit's decision in *Dewey*, which had heavily relied on Establishment Clause avoidance to reject the interpretation of Title VII set out in the EEOC's reasonable-accommodation guidelines.  Just over three weeks later, the Court had handed down its (now abrogated)[7] decision in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971) which

─────────────

[5] "Labor organization[s]" themselves were and are bound by Title VII's nondiscrimination rules.  42 U. S. C. §2000e–2(c) (1964 ed.).

[6] See Pet. for Cert. in *Trans World Airlines, Inc.* v. *Hardison*, O. T. 1975, No. 75–1126, pp. 2–3, 17–22.

[7] See *Kennedy* v. *Bremerton School Dist.*, 597 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 22).

Opinion of the Court

adopted a test under which any law whose "principal or primary effect" "was to advance religion" was unconstitutional. *Id.*, at 612–613. Because it could be argued that granting a special accommodation to a religious practice had just such a purpose and effect, some thought that *Lemon* posed a serious problem for the 1972 amendment of Title VII. And shortly before review was granted in *Hardison*, the Court had announced that the Justices were evenly divided in a case that challenged the 1972 amendment as a violation of the Establishment Clause. *Parker Seal Co.* v. *Cummins*, 429 U. S. 65 (1976) (*per curiam*).

Against this backdrop, both TWA and IAM challenged the constitutionality of requiring any accommodation for religious practice. The Summary of Argument in TWA's brief began with this categorical assertion: "The religious accommodation requirement of Title VII violates the Establishment Clause of the First Amendment." Brief for Petitioner TWA in O. T. 1976, No. 75–1126, p. 19. Applying the three-part *Lemon* test, TWA argued that any such accommodation has the primary purpose and effect of advancing religion and entails "pervasive" government "entanglement . . . in religious issues." Brief for Petitioner TWA in No. 75–1126, at 20. The union's brief made a similar argument, Brief for Petitioner IAM, O. T. 1976, No. 75–1126, pp. 21–24, 50–72, but stressed the special status of seniority rights under Title VII, *id.*, at 24–36.

Despite the prominence of the Establishment Clause in the briefs submitted by the parties and their *amici*,[8] constitutional concerns played no on-stage role in the Court's opinion, which focused instead on seniority rights.[9] The

---

[8] See, *e.g.*, Brief for Chrysler Corporation as *Amicus Curiae* 6–20 (arguing an Establishment Clause violation), and Brief for State of Michigan as *Amicus Curia*e 20–25 (arguing no conflict with the Establishment Clause), in *Trans World Airlines, Inc.* v. *Hardison*, O. T. 1976, No. 75–1126 etc.

[9] The background summarized above and the patent clash between the

Opinion of the Court

opinion stated that "the principal issue on which TWA and the union came to this Court" was whether Title VII "require[s] an employer and a union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices." 432 U. S., at 83, and n. 14. The Court held that Title VII imposed no such requirement. *Ibid.* This conclusion, the Court found, was "supported by the fact that seniority systems are afforded special treatment under Title VII itself." *Id.*, at 81. It noted that Title VII expressly provides special protection for "'bona fide seniority . . . system[s],'" *id.*, at 81–82 (quoting 42 U. S. C. §2000e–2(h)), and it cited precedent reading the statute "'to make clear that

———————

ordinary meaning of "undue hardship" and "more than . . . de minimis" led some to interpret the decision to rest on Establishment Clause concerns. Justice Marshall observed in his *Hardison* dissent that the majority opinion "ha[d] the singular advantage of making consideration of petitioners' constitutional challenge unnecessary." 432 U. S., at 89. A few courts assumed that *Hardison* actually was an Establishment Clause decision. See, *e.g.*, *Gibson* v. *Missouri Pacific R. Co.*, 620 F. Supp. 85, 88–89 (ED Ark. 1985) (concluding that requiring an employer to "incur greater than de minimis costs" related to accommodating a Sabbath "would therefore violate the establishment clause"); see also *Massachusetts Bay Transp. Auth.* v. *Massachusetts Comm'n Against Discrimination*, 450 Mass. 327, 340–341, and n. 15, 879 N. E. 2d 36, 46–48, and n.15 (2008) (construing state law narrowly on premise that *Hardison* might state outer constitutional bounds). Some constitutional scholars also suggested that *Hardison* must have been based on constitutional avoidance. See, *e.g.*, P. Karlan & G. Rutherglen, Disabilities, Discrimination, and Reasonable Accommodation, 46 Duke L. J. 1, 6–7 (1996); M. McConnell, Accommodation of Religion: An Update and a Response to the Critics, 60 Geo. Wash. L. Rev. 685, 704 (1992); cf. *Small* v. *Memphis Light, Gas & Water*, 952 F. 3d 821, 829 (CA6 2020) (Thapar, J., concurring). In doing so, some have pointed to *Hardison*'s passing reference to a need to avoid "unequal treatment of employees on the basis of their religion." 432 U. S., at 84. But the Court later clarified that "Title VII does not demand mere neutrality with regard to religious practices" but instead "gives them favored treatment" in order to ensure religious persons' full participation in the workforce. *EEOC* v. *Abercrombie & Fitch Stores, Inc.*, 575 U. S. 768, 775 (2015).

the routine application of a bona fide seniority system [is] not . . . unlawful under Title VII.'"  432 U. S., at 82 (quoting *Teamsters* v. *United States*, 431 U. S. 324, 352 (1977)).  Invoking these authorities, the Court found that the statute did not require an accommodation that involuntarily deprived employees of seniority rights.  432 U. S., at 80.[10]

Applying this interpretation of Title VII and disagreeing with the Eighth Circuit's evaluation of the factual record, the Court identified no way in which TWA, without violating seniority rights, could have feasibly accommodated Hardison's request for an exemption from work on his Sabbath.  The Court found that not enough co-workers were willing to take Hardison's shift voluntarily, that compelling them to do so would have violated their seniority rights, and that leaving the Stores Department short-handed would have adversely affected its "essential" mission.  *Id*., at 68, 80.

The Court also rejected two other options offered in Justice Marshall's dissent: (1) paying other workers overtime wages to induce them to work on Saturdays and making up for that increased cost by requiring Hardison to work overtime for regular wages at other times and (2) forcing TWA to pay overtime for Saturday work for three months, after which, the dissent thought, Hardison could transfer back to the night shift in Building 1.  The Court dismissed both of these options as not "feasible," *id*., at 83, n. 14, but it provided no explanation for its evaluation of the first.  In dissent, Justice Marshall suggested one possible reason: that the collective bargaining agreement might have disallowed Hardison's working overtime for regular wages.  *Id*., at 95 (dissenting opinion).  But the majority did not embrace that explanation.

---

[10] We do not understand Groff to challenge the continued vitality of *Hardison*'s core holding on its "principal issue" (bracketing his disputes that the memorandum of understanding set forth a seniority system). 432 U. S., at 83, and n. 14.

Opinion of the Court

As for the second, the Court disputed the dissent's con-clusion that Hardison, if he moved back to Building 1, would have had enough seniority to choose to work the night shift. *Id.*, at 83, n. 14. That latter disagreement was key. The dissent thought that Hardison could have re-sumed the night shift in Building 1 after just three months, and it therefore calculated what it would have cost TWA to pay other workers' overtime wages on Saturdays for that finite period of time. According to that calculation, TWA's added expense for three months would have been $150 (about $1,250 in 2022 dollars).[11] *Id.*, at 92, n. 6. But the Court doubted that Hardison could have regained the sen-iority rights he had enjoyed in Building 1 prior to his trans-fer, and if that were true, TWA would have been required to pay other workers overtime for Saturday work indefi-nitely. Even under Justice Marshall's math, that would have worked out to $600 per year at the time, or roughly $5,000 per year today.

In the briefs and at argument, little space was devoted to the question of determining when increased costs amount to an "undue hardship" under the statute, but a single, but oft-quoted, sentence in the opinion of the Court, if taken lit-erally, suggested that even a pittance might be too much for an employer to be forced to endure. The line read as follows: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." *Id.*, at 84.

Although this line would later be viewed by many lower courts as the authoritative interpretation of the statutory term "undue hardship," it is doubtful that it was meant to take on that large role. In responding to Justice Marshall's dissent, the Court described the governing standard quite

---

[11] The dissent appears to have drawn its estimate from Hardison's daily rate at the time of termination ($3.37/hour) and deposition testi-mony on typical overtime rates and shift lengths. See App. in No. 75–1126 etc., at pp. 40, 126.

differently, stating three times that an accommodation is not required when it entails "substantial"  "costs" or "expenditures."  *Id.*, at 83, n. 14.  This formulation suggests that an employer may be required to bear costs and make expenditures that are not "substantial."  Of course, there is a big difference between costs and expenditures that are not "substantial" and those that are "de minimis," which is to say, so "very small or trifling" that that they are not even worth noticing.  Black's Law Dictionary 388 (5th ed. 1979).

The Court's response to Justice Marshall's estimate of the extra costs that TWA would have been required to foot is also telling.  The majority did not argue that Justice Marshall's math produced considerably "more than a *de minimis* cost" (as it certainly did).  Instead, the Court responded that Justice Marshall's calculation involved assumptions that were not "feasible under the circumstances" and would have produced a different conflict with "the seniority rights of other employees."  432 U. S., at 83, n. 14; see Brief for United States 29, n. 4 (noting that *Hardison* "specifically rejected" the dissent's calculations and that it is "wrong to assert" that *Hardison* held that a $150 cost was an undue hardship).

Ultimately, then, it is not clear that any of the possible accommodations would have actually solved Hardison's problem without transgressing seniority rights.  The *Hardison* Court was very clear that those rights were off-limits.  Its guidance on "undue hardship" in situations not involving seniority rights is much less clear.

C

Even though *Hardison*'s reference to "*de minimis*" was undercut by conflicting language and was fleeting in comparison to its discussion of the "principal issue" of seniority rights, lower courts have latched on to "*de minimis*" as the governing standard.

To be sure, as the Solicitor General notes, some lower

Opinion of the Court

courts have understood that the protection for religious adherents is greater than "more than . . . *de minimis*" might suggest when read in isolation.  But a bevy of diverse religious organizations has told this Court that the *de minimis* test has blessed the denial of even minor accommodation in many cases, making it harder for members of minority faiths to enter the job market.  See, *e.g.*, Brief for The Sikh Coalition et al. as *Amici Curiae* 15, 19–20 ("the de minimis standard eliminates any meaningful mandate to accommodate Sikh practices in the workplace" and "emboldens employers to deny reasonable accommodation requests"); Brief for Council on American-Islamic Relations as *Amicus Curiae* 3 (Muslim women wearing religiously mandated attire "have lost employment opportunities" and have been excluded from "critical public institutions like public schools, law enforcement agencies, and youth rehabilitation centers"); Brief for Union of Orthodox Jewish Congregations of America as *Amicus Curiae* 14–15 (because the "*de minimis* cost" test "can be satisfied in nearly any circumstance," "Orthodox Jews once again [are] left  at the mercy of their employers' good graces"); Brief for Seventh-day Adventist Church in Canada et al. as *Amici Curiae* 8 (joint brief of Sabbatarian faiths arguing that Sabbath accommodation under the *de minimis* standard is left to "their employers' and coworkers' goodwill").

The EEOC has also accepted *Hardison* as prescribing a "'more than a *de minimis* cost'" test, 29 CFR §1605.2(e)(1) (2022), but has tried in some ways to soften its impact.  It has specifically cautioned (as has the Solicitor General in this case)  against extending the phrase to cover such things as the "administrative costs" involved in reworking schedules,  the "infrequent" or temporary "payment of premium wages for a substitute," and "voluntary substitutes and swaps" when they are not contrary to a "bona fide seniority system."  §§1605.2(e)(1), (2).

Nevertheless, some courts have rejected even the EEOC's

14                          GROFF *v.* DeJOY

                          Opinion of the Court

gloss on "*de minimis*."[12]  And in other cases, courts have re-
jected accommodations that the EEOC's guidelines con-
sider to be ordinarily required, such as the relaxation of
dress codes and coverage for occasional absences.[13]

Members of this Court have warned that, if the *de mini-
mis* rule represents the holding of *Hardison*, the decision
might have to be reconsidered.  *Small* v. *Memphis Light,
Gas & Water*, 593 U. S. ___ (2021) (GORSUCH, J., dissenting
from denial of certiorari); *Patterson* v. *Walgreen Co.*, 589
U. S. ___ (2020) (ALITO, J., concurring in denial of certio-
rari).  Four years ago, the Solicitor General—joined on its
brief by the EEOC—likewise took that view.  Brief for
United States as *Amicus Curiae* in *Patterson* v. *Walgreen
Co.*, O. T. 2019, No. 18–349, p. 20 ("Contrary to *Hardison*,
therefore, an 'undue hardship' is not best interpreted to
mean 'more than a *de minimis* cost'").

Today, the Solicitor General disavows its prior position
that *Hardison* should be overruled—but only on the under-
standing that *Hardison* does not compel courts to read the

——————

[12] For example, two years ago, the Seventh Circuit told the EEOC that
it would be an undue hardship on Wal-Mart (the Nation's largest private
employer, with annual profits of over $11 billion) to be required to facili-
tate voluntary shift-trading to accommodate a prospective assistant
manager's observance of the Sabbath.  *EEOC* v. *Walmart Stores East, L.
P.*, 992 F. 3d 656, 659–660 (2021).  See Walmart Inc., Wall Street Journal
Markets (June 4, 2023).

[13] See, *e.g.*, *Wagner* v. *Saint Joseph's/Candler Health System, Inc.*,
2022 WL 905551, *4–*5 (SD Ga., Mar. 28, 2022) (Orthodox Jew fired for
taking off for High Holy Days); *Camara* v. *Epps Air Serv., Inc.*, 292 F.
Supp. 3d 1314, 1322, 1331–1332 (ND Ga., 2017) (Muslim woman who
wore a hijab fired because the sight of her might harm the business in
light of "negative stereotypes and perceptions about Muslims"); *El-Amin*
v. *First Transit, Inc.*, 2005 WL 1118175, *7–*8 (SD Ohio, May 11, 2005)
(Muslim employee terminated where religious services conflicted with
"two hours" of training a week during a month of daily training); *EEOC*
v. *Sambo's of Ga., Inc.*, 530 F. Supp. 86, 91 (ND Ga., 1981) (hiring a Sikh
man as a restaurant manager would be an undue hardship because his
beard would have conflicted with "customer preference").

Opinion of the Court

"more than *de minimis*" standard "literally" or in a manner that undermines *Hardison*'s references to "substantial" cost.[14]  Tr. of Oral Arg. 107.  With the benefit of comprehensive briefing and oral argument, we agree.[15]

## III

We hold that showing "more than a *de minimis* cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII.  *Hardison* cannot be reduced to that one phrase.  In describing an employer's "undue hardship" defense, *Hardison* referred repeatedly to "substantial" burdens, and that formulation better explains the decision.  We therefore, like the parties, understand *Hardison* to mean that "undue hardship" is shown when a burden is substantial in the overall context

---

[14] At the certiorari stage, the Government argued against review by noting that Government employees receive "at least as much protection for religious-accommodation claims [under the Religious Freedom Restoration Act (RFRA)] as [under] any interpretation of Title VII."  Brief in Opposition 9.  Courts have not always agreed on how RFRA's cause of action—which does not rely on employment status—interacts with Title VII's cause of action, and the Third Circuit has treated Title VII as exclusively governing at least some employment-related claims brought by Government employees.  Compare *Francis* v. *Mineta*, 505 F. 3d 266, 271 (CA3 2007), with *Tagore* v. *United States*, 735 F. 3d 324, 330–331 (CA5 2013) (federal employee's RFRA claim could proceed even though *de minimis* standard foreclosed Title VII claim).  Because Groff did not bring a RFRA claim, we need not resolve today whether the Government is correct that RFRA claims arising out of federal employment are not displaced by Title VII.

[15] In addition to suggesting that *Hardison* be revisited, some Justices have questioned whether *Hardison* (which addresses the pre-1972 EEOC Guidelines) binds courts interpreting the current version of Title VII.  See *Abercrombie*, 575 U. S., at 787, n. (THOMAS, J., concurring in part and dissenting in part).  As explained below, because we—like the Solicitor General—construe *Hardison* as consistent with the ordinary meaning of "undue hardship," we need not reconcile any divergence between *Hardison* and the statutory text.

of an employer's business.  See Tr. of Oral Arg. 61–62 (argument of Solicitor General).  This fact-specific inquiry comports with both *Hardison* and the meaning of "undue hardship" in ordinary speech.

## A

As we have explained, we do not write on a blank slate in determining what an employer must prove to defend a denial of a religious accommodation, but we think it reasonable to begin with Title VII's text.  After all, as we have stressed over and over again in recent years, statutory interpretation must "begi[n] with," and ultimately heed, what a statute actually says.  *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. 109, ___ (2018) (slip op., at 15) (internal quotation marks omitted); see *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 74 (2023); *Intel Corp. Investment Policy Comm.* v. *Sulyma*, 589 U. S. ___, ___–___, ___ (2020) (slip op., at 5–6, 9). Here, the key statutory term is "undue hardship."  In common parlance, a "hardship" is, at a minimum, "something hard to bear."  Random House Dictionary of the English Language 646 (1966) (Random House).  Other definitions go further.  See, *e.g.*, Webster's Third New International Dictionary 1033 (1971) (Webster's Third) ("something that causes or entails suffering or privation"); American Heritage Dictionary 601 (1969) (American Heritage) ("[e]xtreme privation; adversity; suffering"); Black's Law Dictionary, at 646 ("privation, suffering, adversity").  But under any definition, a hardship is more severe than a mere burden.  So even if Title VII said only that an employer need not be made to suffer a "hardship," an employer could not escape liability simply by showing that an accommodation would impose some sort of additional costs.  Those costs would have to rise to the level of hardship, and adding the modifier "undue" means that the requisite burden, privation, or adversity must rise to an "excessive" or "unjustifiable" level.  Random House 1547; see, *e.g.*, Webster's Third

Opinion of the Court

2492 ("inappropriate," "unsuited," or "exceeding or violating propriety or fitness"); American Heritage 1398 ("excessive"). The Government agrees, noting that "'undue hardship means something greater than hardship.'" Brief for United States 30; see *id.*, at 39 (arguing that "accommodations should be assessed while 'keep[ing] in mind both words in the key phrase of the actual statutory text: "undue" and "hardship"'" (quoting *Adeyeye* v. *Heartland Sweeteners, LLC*, 721 F. 3d 444, 456 (CA7 2013)).

When "undue hardship" is understood in this way, it means something very different from a burden that is merely more than *de minimis*, *i.e.*, something that is "very small or trifling." Black's Law Dictionary, at 388. So considering ordinary meaning while taking *Hardison* as a given, we are pointed toward something closer to *Hardison*'s references to "substantial additional costs" or "substantial expenditures." 432 U. S., at 83, n. 14.

Similarly, while we do not rely on the pre-1972 EEOC decisions described above to define the term, we do observe that these decisions often found that accommodations that entailed substantial costs were required. See *supra*, at 5, nn. 3–4. Nothing in this history plausibly suggests that "undue hardship" in Title VII should be read to mean anything less than its meaning in ordinary use. Cf. *George* v. *McDonough*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 5) (a "robust regulatory backdrop" can "fil[l] in the details" of a statutory scheme's use of a specific term).

In short, no factor discussed by the parties—the ordinary meaning of "undue hardship," the EEOC guidelines that *Hardison* concluded that the 1972 amendment "'ratified,'" 432 U. S., at 76, n. 11 (internal quotation marks omitted), the use of that term by the EEOC prior to those amendments, and the common use of that term in other statutes— supports reducing *Hardison* to its "more than a *de minimis* cost" line. See Brief for United States 39 (arguing that "the Court could emphasize that *Hardison*'s language does not

18 GROFF *v.* DEJOY

Opinion of the Court

displace the statutory standard").

B

In this case, both parties agree that the "*de minimis*" test is not right, but they differ slightly in the alternative language they prefer. Groff likes the phrase "significant difficulty or expense." Brief for Petitioner 15; Reply Brief 2. The Government, disavowing its prior position that Title VII's text requires overruling *Hardison*, points us to *Hardison*'s repeated references to "substantial expenditures" or "substantial additional costs." Brief for United States 28–29 (citing 432 U. S., at 83–84, and n. 14); see Brief for United States 39. We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business. *Hardison*, 432 U. S., at 83, n. 14.

What matters more than a favored synonym for "undue hardship" (which is the actual text) is that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, "size and operating cost of [an] employer." Brief for United States 40 (internal quotation marks omitted).

C

The main difference between the parties lies in the further steps they would ask us to take in elaborating upon their standards. Groff would not simply borrow the phrase "significant difficulty or expense" from the Americans with Disabilities Act (ADA) but would have us instruct lower courts to "draw upon decades of ADA caselaw." Reply Brief 13. The Government, on the other hand, requests that we opine that the EEOC's construction of *Hardison* has been basically correct. Brief for United States 39.

Opinion of the Court

Both of these suggestions go too far. We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today. After all, as a public advocate for employee rights, much of the EEOC's guidance has focused on what should be accommodated. Accordingly, today's clarification may prompt little, if any, change in the agency's guidance explaining why no undue hardship is imposed by temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs. See 29 CFR §1605.2(d). But it would not be prudent to ratify *in toto* a body of EEOC interpretation that has not had the benefit of the clarification we adopt today. What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the commonsense manner that it would use in applying any such test.

D

The erroneous *de minimis* interpretation of *Hardison* may have had the effect of leading courts to pay insufficient attention to what the actual text of Title VII means with regard to several recurring issues. Since we are now brushing away that mistaken view of *Hardison*'s holding, clarification of some of those issues—in line with the parties' agreement in this case—is in order.

First, on the second question presented, both parties agree that the language of Title VII requires an assessment of a possible accommodation's effect on "the conduct of the employer's business." 42 U. S. C. §2000e(j); see 35 F. 4th, at 177–178 (Hardiman, J., dissenting). As the Solicitor General put it, not all "impacts on coworkers . . . are relevant," but only "coworker impacts" that go on to "affec[t] the conduct of the business." Tr. of Oral Arg. 102–104. So an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court

cannot stop its analysis without examining whether that further logical step is shown in a particular case.

On this point, the Solicitor General took pains to clarify that some evidence that occasionally is used to show "impacts" on coworkers is "off the table" for consideration. *Id.*, at 102. Specifically, a coworker's dislike of "religious practice and expression in the workplace" or "the mere fact [of] an accommodation" is not "cognizable to factor into the undue hardship inquiry." *Id.*, at 89–90. To the extent that this was not previously clear, we agree. An employer who fails to provide an accommodation has a defense only if the hardship is "undue," and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered "undue." If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself. See *id.*, at 89 (argument of Solicitor General) (such an approach would be "giving effect to religious hostility"); contra, *EEOC* v. *Sambo's of Georgia, Inc.*, 530 F. Supp. 86, 89 (ND Ga. 1981) (considering as hardship "[a]dverse customer reaction" from "a simple aversion to, or discomfort in dealing with, bearded people").

Second, as the Solicitor General's authorities underscore, Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. See *Adeyeye*, 721 F. 3d, at 455; see also Brief for United States 30, 33, 39. This distinction matters. Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary.

Opinion of the Court

## IV

Having clarified the Title VII undue-hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance. The Third Circuit assumed that *Hardison* prescribed a "more than a de minimis cost" test, 35 F. 4th, at 175, and this may have led the court to dismiss a number of possible accommodations, including those involving the cost of incentive pay, or the administrative costs of coordination with other nearby stations with a broader set of employees. Without foreclosing the possibility that USPS will prevail, we think it appropriate to leave it to the lower courts to apply our clarified context-specific standard, and to decide whether any further factual development is needed.

\*    \*    \*

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

———

No. 22–174

———

GERALD E. GROFF, PETITIONER *v.*
LOUIS DEJOY, POSTMASTER GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 29, 2023]

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, concurring.

As both parties here agree, the phrase "more than a *de minimis* cost" from *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 84 (1977), was loose language. An employer violates Title VII if it fails "to reasonably accommodate" an employee's religious observance or practice, unless the employer demonstrates that accommodation would result in "undue hardship on the conduct of the employer's business." 42 U. S. C. §2000e(j). The statutory standard is "undue hardship," not trivial cost.

*Hardison*, however, cannot be reduced to its "*de minimis*" language. Instead, that case must be understood in light of its facts and the Court's reasoning. The *Hardison* Court concluded that the plaintiff's proposed accommodation would have imposed an undue hardship on the conduct of the employer's business because the accommodation would have required the employer either to deprive other employees of their seniority rights under a collective-bargaining agreement, or to incur substantial additional costs in the form of lost efficiency or higher wages. 432 U. S., at 79–81, 83–84, and n. 14. The Equal Employment Opportunity Commission has interpreted Title VII's undue-hardship standard in this way for seven consecutive Presidential administrations, from President Reagan to President Biden.

SOTOMAYOR, J., concurring

See 29 CFR §1605.2(e) (2022) (citing *Hardison*, 432 U. S., at 80, 84).

Petitioner Gerald Groff asks this Court to overrule *Hardison* and to replace it with a "significant difficulty or expense" standard. Brief for Petitioner 17–38. The Court does not do so. That is a wise choice because *stare decisis* has "enhanced force" in statutory cases. *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015). Congress is free to revise this Court's statutory interpretations. The Court's respect for Congress's decision not to intervene promotes the separation of powers by requiring interested parties to resort to the legislative rather than the judicial process to achieve their policy goals. This justification for statutory *stare decisis* is especially strong here because "Congress has spurned multiple opportunities to reverse [*Hardison*]—openings as frequent and clear as this Court ever sees." *Id.*, at 456–457.[1] Moreover, in the decades since *Hardison* was decided, Congress has revised Title VII multiple times in response to other decisions of this Court,[2] yet never in response to *Hardison.* See *Kimble*, 576 U. S., at 457.

———————

[1] See, *e.g.*, H. R. 1440, 117th Cong., 1st Sess., §4(a)(4) (2021); H. R. 5331, 116th Cong., 1st Sess., §4(a)(4) (2019); S. 3686, 112th Cong., 2d Sess., §4(a)(3) (2012); S. 4046, 111th Cong., 2d Sess., §4(a)(3) (2010); S. 3628, 110th Cong., 2d Sess., §2(a)(1)(B) (2008); H. R. 1431, 110th Cong., 1st Sess., §2(a)(4) (2007); H. R. 1445, 109th Cong., 1st Sess., §2(a)(4) (2005); S. 677, 109th Cong., 1st Sess., §2(a)(4) (2005); S. 893, 108th Cong., 1st Sess., §2(a)(4) (2003); S. 2572, 107th Cong., 2d Sess., §2(a)(4) (2002); H. R. 4237, 106th Cong., 2d Sess., §2(a)(4) (2000); S. 1668, 106th Cong., 1st Sess., §2(a)(4) (1999); H. R. 2948, 105th Cong., 1st Sess., §2(a)(4) (1997); S. 1124, 105th Cong., 1st Sess., §2(a)(4) (1997); S. 92, 105th Cong., 1st Sess., §2(a)(3) (1997); H. R. 4117, 104th Cong., 2d Sess., §2(a)(3) (1996).

[2] See Civil Rights Act of 1991, 105 Stat. 1071 (overruling *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642 (1989)); Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5 (overruling *Ledbetter* v. *Goodyear Tire & Rubber Co.*, 550 U. S. 618 (2007)).

Cite as: 600 U. S. ____ (2023)          3

SOTOMAYOR, J., concurring

Groff also asks the Court to decide that Title VII requires the United States Postal Service to show "undue hardship to [its] *business*," not to Groff's co-workers. Brief for Petitioner 42 (emphasis added); see 35 F. 4th 162, 176 (CA3 2022) (Hardiman, J., dissenting). The Court, however, recognizes that Title VII requires "undue hardship on the *conduct* of the employer's business." 42 U. S. C. §2000e(j) (emphasis added). Because the "conduct of [a] business" plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees. See, *e.g.*, *Hardison*, 432 U. S., at 79–81 (deprivation of employees' bargained-for seniority rights constitutes undue hardship). There is no basis in the text of the statute, let alone in economics or common sense, to conclude otherwise. Indeed, for many businesses, labor is more important to the conduct of the business than any other factor.

To be sure, some effects on co-workers will not constitute "undue hardship" under Title VII. For example, animus toward a protected group is not a cognizable "hardship" under any antidiscrimination statute. Cf. *ante*, at 20. In addition, some hardships, such as the labor costs of coordinating voluntary shift swaps, are not "undue" because they are too insubstantial. See 29 CFR §§1605.2(d)(1)(i), (e)(1). Nevertheless, if there is an undue hardship on "the conduct of the employer's business," 42 U. S. C. §2000e(j), then such hardship is sufficient, even if it consists of hardship on employees. With these observations, I join the opinion of the Court.